Luis Gierbolini Rodríguez y Francisco González, peticionarios, *v.* Rafael Hernández Colón, Gobernador del Estado Libre Asociado de Puerto Rico y otros, demandados.

*Número:* MC-91-70          *Resuelto:* 29 de noviembre de 1991

*Iván Garau Díaz*, abogado de los peticionarios; Anabelle Ro-

dríguez, Procuradora General, y *David Rivé Rivera,* abogados de los demandados; *Carlos Canals Mora, pro se.*

## RESOLUCIÓN

Por carecer este Tribunal de jurisdicción original para considerar una petición de *injunction* y por no reunir el recurso los requisitos de una petición de *mandamus,* a la Petición de *Injunction* Permanente y Otros Remedios en Jurisdicción Original, no ha lugar. Según expresara el Juez Asociado Señor Carlos V. Dávila ante una situación análoga: "La importancia que pueda tener una cuestión para un litigante *no concede jurisdicción a un tribunal para conocer de un pleito si la ley no la establece.* Respetar la ley, tanto la que gobierna la conducta de los individuos como la que gobierna la función de un tribunal, es fundamental para la permanencia de un gobierno de ley." (Énfasis suplido.) *Márquez v. Gierbolini,* 100 D.P.R. 839, 841 (1972).

Lo acordó el Tribunal y certifica el señor Secretario General. Los Jueces Asociados Señor Negrón García y Señor Rebollo López emitieron opiniones disidentes. El Juez Asociado Señor Alonso Alonso no intervino. Todos los Jueces se reservan el derecho a emitir una ponencia conforme lo dispone la Regla 4(b) del Tribunal Supremo, 4 L.P.R.A. Ap. I-A.

*(Fdo.)* Francisco R. Agrait Lladó
*Secretario General*

**– O –**

Opinión disidente del Juez Asociado Señor Negrón García.(¹)

ES INCONSTITUCIONAL EL REFERÉNDUM DE 8 DE DICIEMBRE DE 1991. Es producto de una legislación que paradójicamente vulnera el sustrato de nuestra vida democrática genuina. Intenta "constitucionalizar" un referéndum mediante medios que claramente se desvían del cauce de la Constitución. Nos referimos a la avasalladora campaña ilegal gubernamental publicitaria usando fondos públicos para exaltar exclusivamente su imagen y así promover un voto afirmativo; la masiva campaña oficial —desorientadora, poco objetiva y carente de neutralidad— de la Comisión Estatal de Elecciones; el uso de una papeleta injusta, confusa e incompleta que incide en el derecho a la libre expresión de todo elector, y la presentación de seis (6) propuestas en bloque de forma tal que coacciona su voluntad.

Y es que procesal y sustantivamente "la Constitución, en materia de legislación electoral, rechaza la *improvisa-*

---

(¹) Como método expositivo, subdividimos este disenso como prosigue:

| | Temas | Páginas |
|------|-------|---------|
| I | -*Jurisdicción, legitimidad y justiciabilidad* | 405–414 |
| II | -*Significado y modalidades* | 414–417 |
| III | -*Principios aplicables* ... | 417–419 |
| IV | -*Trasfondo legislativo* ... | 419–420 |
| V | -*Textos de las propuestas; vicios constitucionales* ... | 421–430 |
| VI | -*Inconstitucionalidad del Referéndum como petición* | 431–436 |
| VII | -*Otros defectos visibles en la papeleta* | 436–437 |
| VIII | -*Ilegalidad en campaña pablicitaria oficial de la Comisión Estatal de Elecciones* | 437–439 |
| IX | -*Ilegalidad manifiesta en la campaña publicitaria gubernamental* ... | 439–444 |
| X | -*Conclusiones* | 444–447 |
| | *Apéndices y Anejos* | 448–453 |

*ción, el apasionamiento, el sectarismo y todo aquello que se aleja de la serenidad, imparcialidad y eficacia. El arte de buen gobierno precisa que no se experimente con el sufragio electoral.* No es cosa que se pueda ensayar sin que exponga al país a peligrosas consecuencias". (Énfasis suplido.) *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* 110 D.P.R. 248, 295 esc. 6 (1980), opinión concurrente y disidente.

## I

*Jurisdicción, legitimidad y justiciabilidad*

Este recurso va más allá del debate político, no justiciable, de si debe o no enmendarse la Constitución del Estado Libre Asociado o someterse a la ciudadanía en un referéndum algunas propuestas en torno a sus características de Pueblo y aspiraciones democráticas relacionadas con el *status* político.([2]) *Desde este estrado, el aspecto netamente político y los argumentos de la tribuna —en pro y en contra del Referéndum— no nos competen.* Nuestra misión es juzgar, en estricta juridicidad, "si *los medios elegidos por la*

---

([2]) "Por supuesto, el mero hecho de que el pleito busque la protección de un derecho político no quiere decir que presente una cuestión política. Tal objeción 'es poco más que un juego de palabras.' " (Traducción nuestra.) *Baker v. Carr,* 369 U.S. 186, 209 (1962). Y es que el derecho al voto es de rango constitucional.

"Los *hechos políticos* no siempre son cosas exclusivamente de políticos, sino *también de juristas.* No puede éste liberarse de responsabilidad diciendo: 'No es cuestión de derecho, y por eso, tampoco de mi incumbencia', como si fuese un simple técnico del derecho, o un historiador, oficio, el más cómodo, para ir pasando y estar siempre en diarios y revistas con motivo de las sesiones académicas, donde se habla de hechos lejanos, y donde el prudente eclecticismo, la cronología, la arqueología, se consideran sin riesgo alguno, como no sean las polémicas bizantinas de que se enteran unos pocos desocupados." R. Bielsa, VIII (Núm. 16) Rev. del Colegio de Abogados de la Plata 278 (1966).

Los casos que versan sobre el goce y ejercicio de los derechos políticos no son cuestiones políticas, del mismo modo que no son casos económicos porque litiguen dos economistas o la controversia sea un área económica. "¡No corresponde ocuparse, naturalmente, *de aquellos otros que, impresionados por la vibración, diré sonora, de las palabras 'cuestiones políticas',* no penetran el concepto de la 'justiciabilidad', y piensan, nada menos, que se pretende 'politizar a la justicia' cuando lo que se quiere es '*despolitizar* a las soluciones jurídicas' ...!" L.M. Boffi Boggero, *La función judicial y la abogacía,* pág. 1104.

*Asamblea Legislativa* son compatibles con nuestra Constitución en su proyección multidimensional. Lo contrario es claudicar la función judicial". (Énfasis suplido.) *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 631 (1988), opinión disidente.

Los electores Luis Gierbolini Rodríguez y Francisco González, de afiliación estadista, cuestionan por distintos fundamentos la validez constitucional de la *Ley de Garantía de Derechos Democráticos*, Ley Núm. 85 de 9 de septiembre de 1991, y su *ley habilitadora* del Referéndum sobre la reclamación de derechos democráticos (Ley Habilitadora), Ley Núm. 86 del 2 de octubre de 1991.

En recta hermenéutica constitucional y legal, poseemos jurisdicción original —primera instancia— para conocer de esta instancia tripartita que se proyecta como una *petición de "mandamus"* —*Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *P.P.D. v. Ferré, Gobernador*, 98 D.P.R. 338 (1970); *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264 (1960); *Martínez v. Vda. de Morales*, 72 D.P.R. 210 (1951); *Partido Popular v. Gallardo*, 56 D.P.R. 706 (1940); *Mun. de Quebradillas v. Sec. Ejecutivo*, 27 D.P.R. 147 (1919); *Negrón Et. Al. v. El Superintendente de Elecciones*, 11 D.P.R. 366 (1906); *Palmer v. Guerra*, 9 D.P.R. 555 (1905); *Delgado v. El Consejo Ejecutivo de Puerto Rico*, 7 D.P.R. 410 (1904)— *petición de "injunction" y declaración o decreto de inconstitucionalidad.*

No existe problema alguno en cuanto al aspecto de la *legitimación activa (standing)* de los peticionarios Gierbolini Rodríguez y González. "El sujeto principal de la arquitectura moderna constitucional-electoral tutelado *es el elector individual.*" (Énfasis suplido.) *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 407 (1980). Como verdaderos destinatarios del sistema, el Art. 2.001 de la Ley Electoral de Puerto Rico, *in fine*, 16 L.P.R.A. sec. 3051, expresamente les concede como "electores la *capacidad para iniciar* o *promover cualesquiera acciones legales* al amparo de [la] *Declaración de Derechos y Prerrogativas de los Electores* ante

el *Tribunal de Primera Instancia* que corresponda". (Énfasis suplido.)

Aunque de ordinario ello implica que los electores deben acudir primero al Tribunal de Distrito o Superior, es lógico concluir que nuestras puertas, en jurisdicción original —*primera instancia*— están también abiertas para entender y atender directamente situaciones meritorias, apremiantes y extraordinarias.

El Art. 649 vigente del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3421, nos confiere jurisdicción por razón de la *petición de "mandamus"*. Dicho precepto —producto de principios de siglo (1903)— sigue el enfoque histórico ritualista de auto "altamente privilegiado". Sin embargo, los aires de liberalismo procesal moderno se han encargado de atemperarlo.

En *Hernández Agosto v. Romero Barceló*, supra; *Dávila v. Superintendente de Elecciones*, supra, y en *Partido Popular v. Gallardo*, supra, sentamos las pautas que deben cumplirse para que ejercitemos esa jurisdicción original, a saber: que la petición de *mandamus* vaya dirigida contra uno de los principales funcionarios del Gobierno, que se levanten cuestiones de gran interés público y que el asunto requiera una solución pronta y definitiva.

*Esta petición de "mandamus" representa uno de los mejores ejemplos del tipo situacional visualizado que justifica nuestra firme intervención.* Va dirigida contra el Presidente y los miembros de la Comisión Estatal de Elecciones, organismo gubernamental que de manera específica está ministerialmente "*obligad*[o] al cumplimiento de un acto [(controlar y limitar los anuncios gubernamentales)] que la[s] ley[es electorales y del referéndum] particularmente orden[an] … ". (Énfasis suplido.) Art. 650 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3422. La única limitación que contiene la definición del auto de *mandamus*, a saber, que "el auto no puede tener dominio sobre la discreción *judicial*" —(énfasis suplido) íd.— no está presente

aquí. La petición *no* va dirigida contra un tribunal de justicia de inferior categoría. Es cuestión de interés público "que las leyes se pongan en ejecución ... y el *mandamus* tiene por objeto conseguir la ejecución de un deber público...". (Énfasis suplido.) *Asociación de Maestros v. Pérez, Gobernador Int.*, 67 D.P.R. 848, 851 (1947).

Se levantan cuestiones legales y constitucionales importantísimas y nunca antes resueltas, de cuya solución depende la legitimidad del proceso del referéndum. No podemos olvidar que en jurisdicción original actuamos como tribunal de *primera* y *última instancia.* Bajo *nuestra Constitución, es este Foro —no la Comisión Estatal de Elecciones ni los tribunales de instancia— el árbitro final de las controversias constitucionales. Santa Aponte v. Ferré Aguayo*, 105 D.P.R. 670 (1977); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977). Ese ejercicio dual jurisdiccional nos faculta a considerar *todos los méritos* de un caso más allá de las "infracciones de ley o quebrantamientos de forma ... señalados, alegados o salvados por los litigantes, o según se hiciera constar en sus exposiciones y excepciones ... para la mejor administración de justicia y del derecho ...". Sec. 1 de la Ley de 12 de marzo de 1903 (4 L.P.R.A. sec. 36); *Ab intestato Marini Pabón*, 107 D.P.R. 433, 439–440 (1978); *Dávila v. Valdejully*, 84 D.P.R. 101, 103–104 (1961); *Piovanetti v. Vivaldi*, 80 D.P.R. 108, 122–123 (1957); *Rivera v. Sucn. Lugo*, 42 D.P.R. 189, 193 (1931).

Es innegable cómo el factor tiempo incide. Se nos pide urgentemente nuestra intervención. Tomamos conocimiento judicial de que el pasado viernes 22 el Presidente de la Comisión Estatal de Elecciones, Lcdo. Juan R. Melecio, resolvió que el Art. 8.001 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3351 —que prohíbe los anuncios gubernamentales para propaganda en año de elecciones— no aplicaba al Referéndum. De ese modo denegó los requerimientos de los Comisionados Electorales del Partido Nuevo Progresista (P.N.P.) y el Partido Independentista Puerto-

rriqueño (P.I.P.) quienes, distinto al del Partido Popular Democrático (P.P.D.), sostuvieron lo contrario. Es obvio, pues, que sólo mediante un *mandamus* pueda remediarse la situación. Faltan escasamente nueve (9) días naturales para el 8 de diciembre. De éstos, sólo cinco (5) son laborables. "EN EL JUZGAR, EL SENTIDO COMÚN TIENE UN PAPEL PREPONDERANTE." *Villanueva v. Hernández Class*, 128 D.P.R. 618, 653 (1991), opinión concurrente y de conformidad. Esta controversia requiere, pues, una pronta y definitiva solución. Repetimos, de ella dependerá en gran medida la validez constitucional de ese evento.

En el aspecto técnico hemos descartado todo rigorismo formal del pasado. Nuestro Reglamento dispone que las Reglas de Procedimiento Civil son aplicables al auto de *mandamus* "únicamente en cuanto las mismas no conflijan con [nuestro] Reglamento, se adapten *a la eficiente tramitación de la causa*, y *cumplan los fines de la justicia*". (Énfasis suplido.) Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A, R. 14(b). Véase, además, *Hernández Agosto v. Romero Barceló*, supra, pág. 413. "Debemos repetirlo *ad nauseam*, aunque consista en recordar lo admitido por todo el mundo, porque ningún sistema de derecho puede vivir si, a base de los formalismos procesales que son innecesarios, se ahogan las posibilidades de hacer justicia sustancial." *Piovanetti v. Vivaldi*, supra, pág. 123. Aunque reconocemos que la petición ante nos, en su estructura interna expositiva, no es el mejor modelo, en lo básico —comparado con otros recursos que en el pasado hemos considerado en los méritos— cumple con los requisitos de forma y sustancia de la Regla 14(c) del Reglamento del Tribunal Supremo, 4 L.P.R.A. Ap. I-A.

Distinto al criterio mayoritario, según indicado, el recurso *no* se apuntala exclusivamente en un *injunction*. No basta invocar unas expresiones limitantes y concurrentes plasmadas en *Márquez v. Gierbolini*, 100 D.P.R. 839, 841

(1972). Las mismas son inaplicables. Primero, la resolución del Tribunal allí emitida, si bien declinó la jurisdicción sobre el *mandamus*, le dio traslado al Tribunal Superior, Sala de San Juan. Segundo, distinto al de autos, no había urgencia. Para aquel evento electoral de 7 de noviembre de 1972 faltaban treinta y ocho (38) días, tiempo más que suficiente para que se acudiera ante el Tribunal Superior. Y, tercero, se caracteriza *también* como un *mandamus*; *en esencia lo es*. En la Petición de *injunction* permanente, págs. 6–7 —Apartado 3 de los hechos— expresamente y sin ambages se alega "[q]ue los demandados Lcdo. Juan R. Melecio, Presidente de la Comisión Estatal de Elecciones; el Lcdo. Eudaldo Báez Galib, Comisionado Electoral del Partido Popular Democrático; el Lcdo. Carlos Canals Mora, Comisionado Electoral del Partido Nuevo Progresista; y el Lcdo. Manuel Rodríguez Orellana, Comisionado Electoral del Partido [Independentista Puertorriqueño], son el cuerpo rector de la Comisión Estatal de Elecciones y *han faltado en su obligación de poner en vigor, instrumentar y hacer cumplir la Ley Electoral de Puerto Rico*, la cual está siendo violada por los otros demandados en la dimensión antes señalada". Luego de discutir las alegaciones de esta *causa de acción* y exponer otros fundamentos, en la súplica nos piden que emitamos "un injunction *o remedio* contra la Comisión Estatal de Elecciones, su Presidente y Comisionados Electorales para que *pongan en vigor las disposiciones de la Ley Electoral de Puerto Rico, y proh[í]ban la campaña de publicidad antes señalada*". Íd., pág. 19. Las alegaciones y el lenguaje claramente lo enmarcan dentro del *mandamus*.

Cualesquiera dudas al respecto quedan disipadas "en virtud de la insoslayable obligación que tiene todo tribunal de dictar sentencia en atención al 'principio de *hacer justicia* a la luz de los hechos de cada caso y el derecho aplicable, *aun cuando la teoría jurídica que se haya escogido está equivocada*". (Énfasis suplido.) *Sánchez v. Eastern Air Li-*

*nes, Inc.*, 114 D.P.R. 691, 695 (1983). Es elemental este principio que rechaza como arcaica la teoría de que una parte no puede, en instancia o en *apelación*, variar su teoría del caso. Íd., pág. 695. Ello aplica también a este Foro. Con mayor razón, en instancias electorales —de interés público— en que están en juego el prestigio, la seriedad y la confiabilidad de nuestro proceso democrático. "[C]uando de hacer justicia se trata, especialmente en áreas de gran interés público, no hay moldes técnicos que limiten o aprisionen los remedios justos." *Negrón Rivera y Bonilla, Ex parte*, 120 D.P.R. 61, 73 (1987). Y es que la Regla 72 de Procedimiento Civil, 32 L.P.R.A. Ap. III, marca el único rumbo: "Cualquier defecto en la denominación del pleito o en la súplica no será óbice para que el tribunal conceda el remedio...". Rehusamos sostener la ausencia de jurisdicción. "La VERDAD y la JUSTICIA, como fuerzas vivas, no pueden cimentarse en tan frágil ficción .... *AUNQUE GUARDIANES DE ESTA JURISDICCIÓN APELATIVA, NUESTRO CELO MAYOR ES PREVENIR LAS INJUSTICIAS.*" *Villanueva v. Hernández Class*, supra, pág. 657.

Establecida nuestra jurisdicción *original* en virtud de la petición de *mandamus*, para hacerla efectiva, es evidente nuestra facultad *incidental* para librar mandamientos de *injunction*. *Santa Aponte v. Ferré Aguayo*, supra; Art. 676 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3522. Nada impide estudiarlo a fondo y disponer todos los remedios. Sería un absurdo y fracaso total de la justicia que emitiéramos el *mandamus* y decreto de inconstitucionalidad y no el *injunction*. En consecuencia, en jurisdicción *original* —primaria e incidental— acogemos esos reclamos.([3]) No tenemos el beneficio de la comparecencia

---

([3]) En síntesis, alegan, exponen y argumentan que la propaganda de anuncios gubernamentales —sobre la cual se nos pide tomemos conocimiento judicial— y el uso de fondos públicos violan la letra y el espíritu de la Ley Electoral de Puerto Rico, y a nivel constitucional, la igual protección de las leyes y el derecho a la libre

de todos los codemandados quienes, según certificación, fueron notificados por correo y personalmente. Sólo contamos con la del Presidente de la Comisión Estatal de Elecciones, licenciado Melecio, en la que pide su desestimación por falta de jurisdicción original, y la del Comisionado Electoral del P.N.P., Lcdo. Carlos Canals Mora, en la que se somete y se allana a la petición. Es inexplicable, por no decir extraño, que al cabo de una semana ninguno otro de los codemandados haya comparecido.

Descargamos la tarea anticipando la crítica seria, honesta y responsable. También aceptamos la injusta, producto de lo volátil del asunto y del apasionamiento de mentes fanáticas, cerradas o prejuiciadas. *Estamos acostumbrados.* Como jurisprudentes, siempre tratamos de desentrañar la *verdad jurídica objetiva,* misión que en una sociedad civilizada es una de las formas más elevadas de manifestar nuestro respeto hacia la dignidad humana. "No disfrutamos de un exceso de instituciones dedicadas a la búsqueda racional de la verdad ... los jueces están entrenados para abrocharse sus abrigos y resistir las ventiscas de la propaganda, no importa la dirección que éstas soplen". (Traducción nuestra.) P.A. Freund, *The Supreme Court of the United States,* Nueva York, MacMillan Co., 1961, págs. 189–190. "La independencia institucional del Poder Judicial deriva inexcusablemente de la esencia de su función: determinar el derecho y atribuir derechos. Teniendo ésta como base del conocimiento, que no tolera mandatos —*porque nunca podrían convertir lo falso en verdadero, ni al contrario*— *su independencia brota como exigencia lógica, al margen de cualquier contingencia política.*" (Énfasis suplido.) V. Comeiro, citado por R. de

---

expresión. Art. VI, Sec. 7 y Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1.

Como parte de la discusión del primer señalamiento, sostienen que ambas leyes ignoran el trámite constitucional establecido en el Art. VII, Sec. 1 de nuestra Constitución, L.P.R.A., Tomo 1, y que engañan al elector al no incluir en la papeleta los Arts. 3 y 5 de la Ley Núm. 85 de 17 de septiembre de 1991, aun cuando éstos son el fundamento de toda la campaña oficial de la Comisión Estatal de Elecciones.

Marino, *La independencia de los tribunales, garantía de su función*, 1988 Rev. Der. Proc. 431, 447 (1988).

Recapitulando, nuestro análisis constitucional se nutre de fundamentos jurídicos; dejamos a los políticos los restantes argumentos. De entrada aclaramos el prisma judicial pertinente: *la preeminencia del derecho al sufragio.* En nuestro país, incuestionablemente existe un *"mandato* insoslayable en la Carta de Derechos[, Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1](4) imponiéndole la obligación [a la Asamblea Legislativa] de *garantizar* —palabra clave— la *pureza* del sistema electoral. Proviene de 'garante', esto es, que da garantía, asegurando y protegiendo algo contra algún riesgo o necesidad". (Énfasis en el original.) *P.S.P., P.P.D., P.I.P. v. Romero Barceló,* supra, págs. 294-295.

La Leyes Núms. 85 y 86, *supra,* visualizan un referéndum en *dos (2) vertientes;* la primera, como un *reclamo* ciudadano para que se garanticen en la Constitución seis (6) propuestas de derechos democráticos, y la segunda, como una *petición* al Congreso y al Presidente de Estados Unidos para que respeten esos derechos al actuar sobre nuestro *status* político.

En principio, constitucionalmente hablando, no hay —ni puede haber— reparo a consultas o referéndum en que se le someta al electorado asuntos relativos al presente y futuro *status* político. Tampoco puede haber obstáculos a elevar a la Constitución sus anhelos de Pueblo y otros derechos concretos. Aquí el problema es otro: ambas leyes infringen la Sec. 2 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, y distan mucho de cumplir el propósito cardinal de toda elección o consulta electoral, a saber, "obtener la expresión de la voluntad de los votantes que cons-

---

(4) Dispone:
"Las leyes *garantizarán* la expresión de la voluntad del pueblo mediante el sufragio universal, *igual,* directo y secreto, *y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral."* (Énfasis suplido.) Art. II, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 261.

tituyen el cuerpo electoral de un país". *La Nueva Constitución de Puerto Rico*, Escuela de Administración Pública, Ed. U.P.R., 1954, pág. 307. Y es que el mandato de "garantizar" el sufragio electoral impide referéndum discriminatorios, pues se proyecta sobre la Asamblea Legislativa en una dimensión sobreentendida: *la buena fe*, que "como principio general del derecho, a través de la interpretación e integración de las normas, haciendo que el derecho, no se maneje de espaldas a su fundamento ético, sino como un factor informante y espiritualizador". O. Alfredo Gozaini, *La buena fe en el proceso*, 1986-D Rev. Jur. Arg. La Ley 877, 886 (1986). Repetimos, estos requisitos constitucionales no los cumplen las referidas Leyes Núms. 85 y 86.

De rigor un rápido recorrido sobre lo que es y presupone un referéndum.

## II

*Significado y modalidades*

La palabra *referéndum* viene del latín *referre*, esto es, *referir.* "Expresa Posada, en su obra *El Sufragio*, que hoy se llama *referéndum* a 'la función del sufragio por virtud de la cual éste interviene en la adopción definitiva de las leyes, ejercitando como una especie de prerrogativa de veto y de sanción, análoga en su alcance a la que es corriente atribuir a los monarcas constitucionales'. Por el *referéndum* interviene el pueblo en forma directa en el régimen político estatal; participa, de cierta manera, en la sanción de las leyes y decide en última instancia las resoluciones que le afectan en forma directa. Por el *referéndum*, en realidad, se ejerce una democracia pura, genuina; ya que, al someterse directamente las leyes al voto del pueblo, éste decide participando sin intermediarios o representantes en la elaboración de las normas que han de ser obligatorias." G. Cabanellas, *Diccionario Enciclopédico de Derecho*

*Usual*, 20ma ed., Buenos Aires, Ed. Heliasta, 1981, T. VII, pág. 77.

Sobre sus modalidades y clases se hacen varias distinciones. "El referéndum puede ser 'constitucional' o 'legislativo', según que recaiga sobre decisiones correspondientes a la órbita del *poder constituyente o del poder constituido, respectivamente.* Cabe distinguir luego entre referéndum 'consultivo' o *'ante legem',* y de *'ratificación'* o *'post-legem',* si se atiende a la oportunidad en que se lleva a cabo. Finalmente, en cuanto a su alcance o extensión, la consulta popular puede ser de naturaleza 'obligatoria' o simplemente 'facultativa'." (Énfasis suplido.) M. Padilla, *El referéndum ¿técnica necesaria de participación política?*, 1978-D Rev. Jur. Arg. La Ley 925 (1978). Véanse: L. Sánchez Agesta, *Principios de Teoría Política*, 5ta ed., Madrid, Editora Nacional, 1974, pág. 290; J.A. Garrone, *Diccionario Jurídico Abeledo-Perrot*, Buenos Aires, Ed. Abeledo-Perrot, 1988, T. III, pág. 263; M. Ossorio, *Diccionario de ciencias jurídicas, políticas y sociales*, Buenos Aires, Ed. Heliasta, 1984, pág. 650.

En Puerto Rico acogimos esa visión. "El propósito principal del referéndum es, por supuesto, determinar si el cambio propuesto tiene o no el respaldo del electorado." *La nueva Constitución de Puerto Rico, op. cit.*, pág. 531. Ello implica un voto consciente y *"exige que el texto de la enmienda se difunda ampliamente"* y con suficiente antelación. (Énfasis suplido.) Íd., pág. 532. "Para que los ciudadanos voten con conocimiento de causa, no se les debe *sobrecargar* sometiéndoles *varias enmiendas a la vez.* Es importante, por lo tanto, *que se imponga alguna clase de límite ....*" (Énfasis suplido.) Íd., pág. 532. La Asamblea Constituyente aceptó ambas recomendaciones. El Art. VII, Sec. 1 de la Constitución, L.P.R.A., Tomo 1, consignó que "no podrán someterse más de tres propuestas en una sola votación [y] la votación de las enmiendas [será] por

separado". 4 Diario de Sesiones de la Convención Constituyente 2559–2560 (1951).

Como ayuda extrínseca, los antecedentes y el debate de la Asamblea Constituyente revelan una discusión *in extenso* del referéndum como procedimiento especial de enmienda constitucional. Diario de Sesiones, *supra*, T. 3, págs. 1827–1850. El Art. VII, Sec. 1, *supra*, "persigue dos objetivos básicos: hacer de la [C]onstitución un documento estable, de mayor autoridad y dignidad que una ley, a la vez que un instrumento flexible, sensible a cambios fundamentales en la opinión pública y en las necesidades sociales". Diario de Sesiones, *supra*, T. 4, pág. 2559.

En su análisis la Asamblea Constituyente tuvo el beneficio de los estudios de la Escuela de Administración Pública de la Universidad de Puerto Rico. Se le subrayó que la vitalidad y el respeto de una Constitución dependía del *consenso* o acuerdo general al adoptarse, y del grado en que pudiera después modificarse para que se atempere a los cambios futuros. *La Nueva Constitución de Puerto Rico, op. cit.*, pág. 519. En consideración a las diferencias entre una Constitución y una legislación ordinaria, recalcaron que "[l]a enmienda constitucional *presupone*, primeramente, que *se usen procedimientos especiales* para garantizar que dicha enmienda está en *efecto respaldada por el consenso* que en realidad representa la aquiescencia general al cambio propuesto. En segundo término, como envuelve *una alteración de fundamentos, presupone una consideración más cuidadosa y deliberada que la que necesita dársele a los cambios en la ley ordinaria*". (Énfasis suplido.) *La Nueva Constitución de Puerto Rico, op. cit.*, pág. 521. A la luz de estos presupuestos y la experiencia de otras latitudes, como métodos especiales, recomendaron sólo enmiendas propuestas por la Legislatura al electorado y por convención constitucional; *no recomendaron la iniciativa popular.* Íd., pág. 522.

SE ADVIERTE, PUES, QUE EL CONSENSO ES LA

FUERZA INICIAL VITAL QUE IMPRIME ESTABILI-
DAD Y RESPETO SOCIAL A TODA CONSTITUCIÓN. EL
*CONSENSO*, COMO ELEMENTO CRUCIAL, *TRAS-
CIENDE* LA ETAPA DE SU PROMULGACIÓN
ORIGINAL. LATE EN LAS CLÁUSULAS ESPECIALES
DE ENMIENDAS MEDIANTE UNAS GARANTÍAS QUE
TOMAN LA FORMA DE LIMITACIONES SUSTANTIVAS
Y PROCESALES. POR TAL RAZÓN EL PODER DE LA
ASAMBLEA LEGISLATIVA NO ES IRRESTRICTO. EL
REQUISITO DE DOS TERCERAS PARTES DE TODOS
LOS LEGISLADORES NO ES OTRA COSA QUE UNA
CARACTERÍSTICA DE CONSENSO MÍNIMO. IGUAL-
MENTE ES LA PROHIBICIÓN DE QUE *NO PUEDEN
SOMETERSE MÁS DE TRES (3) PROPUESTAS* Y, ADE-
MÁS, QUE SIEMPRE SE VOTEN SEPARADAMENTE.

## III

*Principios aplicables a un referéndum*

Se impone en apretada síntesis un inventario de los
principios elementales jurídico-electorales aplicables a un
referéndum, dimanantes del deber que tiene la Asamblea
Legislativa de *siempre garantizar* la pureza electoral, el
ejercicio del voto y, como derecho correlativo, *la libre
expresión.*

*Primero, cualquier referéndum o consulta sometida al
electorado no puede ser engañosa.* La ambigüedad —inten-
cional o no— en el lenguaje de cualesquiera propuestas es
incompatible con nuestra Constitución y democracia. La
razón es sencilla: "SABIDO ES QUE EL IDIOMA POSEE,
ENTRE SUS MÚLTIPLES ELEMENTOS, LA POSIBILI-
DAD DE RESULTAR AMBIGUO. Esto es, las palabras no
siempre informan directa e inequívocamente. En esos ca-
sos ocurre entonces un resultado que niega la esencia
misma    de    la    lengua:    UN    PROBLEMA    DE

INCOMUNICACIÓN." (Énfasis en el original.) *Granados v. Rodríguez Estrada V*, 127 D.P.R. 1, 349 (1991), opinión disidente. Ello significa que las propuestas han de ser específicas y claras. En sus particulares esenciales han de cumplir con los requisitos estatutarios y constitucionales.

*Segundo*, el referéndum es *nulo* si se celebra con restricciones que impiden al elector emitir libremente su expresión, esto es, depositar su voto individual e inteligente.

*Tercero*, aunque usualmente no es menester someter —mediante su inclusión en la papeleta— *todo* el *texto de ley*, su validez exige que se brinde a la ciudadanía el conocimiento cabal de las propuestas y sobre lo que van a votar. Es *imperativo*, además, que en la *papeleta se incluyan y aparezcan todos* los elementos informativos necesarios para una decisión racional, ilustrada y completa. Ello incluye las consecuencias y los efectos de un voto afirmativo o negativo. La existencia sustancial de un vacío insalvable entre la ley, estos extremos y la papeleta *anulan a priori el referéndum.*

*Cuarto*, el criterio judicial para evaluar la validez y suficiencia legal de la papeleta a usarse es si la misma brinda al elector la alternativa de votar a favor o en contra de determinada(s) propuesta(s). Ese examen judicial se realiza visualmente a base de lo que sólo revela el documento de la papeleta —tal y como es presentada al elector— *vis-à-vis* la ley; y, claro está, sin ignorar *la información oficial diseminada al respecto.*

*Quinto*, la obligación legislativa de garantizar la pureza electoral y la libre expresión conlleva que las propuestas sometidas a la ciudadanía estén presentadas de forma constitucionalmente apropiada; deben brindar a los electores suficiente oportunidad para expresar su libre voluntad. Dicho de otro modo, constitucionalmente en un referéndum no pueden someterse dos (2) o más propuestas juntas, de modo tal que la expresión del elector sobre una conteste las otras.

Y *sexto*, es inconstitucional la combinación de varias propuestas de derechos que, por su presentación unitaria o en bloque, *obliguen* al elector a contestar afirmativa o negativamente *todos* los derechos, aun cuando de su faz exista incompatibilidad. Constitucionalmente sólo pueden presentarse en bloque si *todas* las distintas partes de las propuestas así *englobadas* están evidente y naturalmente relacionadas, no son incompatibles y, al ser unidas, forman de hecho una propuesta sola, *completa y armoniosa*.

En síntesis, el análisis jurídico final es si existe una relación natural entre *todas* las propuestas incluidas en la papeleta. Si de un lado hay propuestas que contienen sujetos separados e independientes, entonces no son susceptibles a combinarse en la papeleta como una sola. Estaríamos claramente ante el propósito ilegal de juntarlas para lograr acumular votos para todas. Ello, en sus dos (2) alternativas —afirmativa o negativa— atentaría contra la libre expresión del elector.

## IV

### *Trasfondo legislativo del Referéndum del 8 de diciembre*

Con estas consideraciones en mente expongamos, sucinta pero escrupulosamente, el trasfondo del Referéndum que nos ocupa.

Conforme la Exposición de Motivos de la Ley Núm. 85, *supra*, sus antecedentes inmediatos fueron las Resoluciones Concurrentes Núm. 41 del Senado y Núm. 54 de la Cámara. Las mismas tuvieron "el propósito de autorizar un referéndum para *enmendar la Carta de Derechos de la Constitución del Estado Libre Asociado de Puerto Rico*, para incorporar los derechos democráticos del Pueblo de Puerto Rico, a que se refiere el artículo segundo de esta ley *que deben regir cualquier consulta para variar nuestro 'status' político*". (Énfasis suplido.) 1991 Leyes de Puerto Rico

808. A renglón seguido, la Exposición de Motivos señala que "dichas Resoluciones Concurrentes, aunque contaron con el concurso mayoritario de los miembros de la Asamblea Legislativa en ambos cuerpos, *no pudieron ser aprobadas por no recibir el endoso requerido por la Constitución* de dos terceras partes de los miembros de cada Cámara Legislativa". (Énfasis suplido.) Leyes de Puerto Rico, *supra*, pág. 808. Inmediatamente después, se "reconoce solemnemente el postulado básico de la democracia de *que las cuestiones fundamentales* que definen el *futuro político* de una sociedad *deben ser refrendadas por el voto directo del pueblo*". (Énfasis suplido.) Íd., pág. 809. Subsiguientemente, se expone la conveniencia de *"separar estos asuntos de la discusión en las elecciones generales"*. (Énfasis suplido.) Íd. La Exposición de Motivos termina concluyendo que "es necesario que *el Pueblo* de Puerto Rico tenga un vehículo mediante el cual *exprese* al Gobierno de Puerto Rico la *deseabilidad de consagrar estos derechos democráticos en la Constitución* del Estado Libre Asociado de Puerto Rico y *peticione* al de los Estados Unidos *los derechos democráticos que deben regir toda consulta sobre nuestro futuro político*". (Énfasis suplido.) Íd.[5]

---

[5] En buena lógica y juridicidad, cualquier derecho a incluirse en la Constitución entraña el poder reivindicador en nuestros tribunales. El legislador no debe confundir los derechos concretos vindicables en los foros judiciales con las declaraciones sobre cultura, identidad colectiva y otros valores análogos importantes que pertenecen más bien al catálogo del Preámbulo. Parafraseando a Frías, "son el 'imaginario [puertorriqueño]', o sea las representaciones mentales depositadas en nuestra memoria colectiva, el nivel de conciencia en que se agolpan las interpretaciones de nuestros símbolos y nuestros comportamientos. *Nos imaginamos así. Si no es nuestro presente, es nuestro deber ser, nuestro 'futurable'* ". (Énfasis suplido.) P.J. Frías, *Los Preámbulos como Imaginario Argentino*, 1988-C Rev. Jur. Arg. La Ley 1101 (1988).

# V

*Textos de las propuestas; vicios constitucionales que surgen de su faz en la vertiente conducente a una enmienda constitucional*

Con estos propósitos legislativos en mente, reproduzcamos primero el Art. 2 de la Ley Núm. 85, *supra*:

Se dispone que *se presente al pueblo de Puerto Rico para su aprobación* la siguiente Reclamación de Derechos Democráticos:

"Nosotros, el pueblo de Puerto Rico, solemnemente *reclamamos que se garantice en nuestra Constitución*, los siguientes derechos democráticos:

[Primero,] "el derecho inalienable a determinar libre y democráticamente nuestro status político

[Segundo,] "el derecho a escoger un *status* de plena dignidad política sin subordinación colonial, ni territorial, a los poderes plenarios del Congreso

[Tercero,] "el derecho a votar por las tres alternativas de *status*, Estado Libre Asociado, Estadidad e Independencia, fundamentadas en la soberanía del Pueblo de Puerto Rico

[Cuarto,] "el derecho a que la alternativa triunfante en una consulta de status requiera más de la mitad de los votos emitidos

[Quinto,] "el derecho a que toda consulta sobre *status* garantice, bajo cualquier alternativa, nuestra cultura, idioma e identidad propia, que incluye nuestra representación deportiva internacional

[Sexto,] "el derecho a que toda consulta sobre *status* garantice, bajo cualquier alternativa, la ciudadanía americana que salvaguarda la Constitución de los Estados Unidos de América". (Énfasis y numeración de propuestas suplidos.) Leyes de Puerto Rico, *supra*, pág. 809.

Este texto, según el modelo, aparecerá *ad verbatim* en la papeleta inmediatamente debajo de las columnas o encasillados [SÍ] y [NO]. Después, en su parte inferior, como *única información adicional*, estará la afirmación siguiente: "Esta reclamación *constituye un reclamo al Gobierno de Puerto Rico* para que *estos derechos se con-*

*sagren en la Constitución del Estado Libre Asociado de Puerto Rico* y una *petición* al Presidente de los Estados Unidos y el Congreso para que estos derechos sean respetados al actuar sobre nuestro status político." (Énfasis suplido.) Anejo 1. Tomamos nota de que el diseño y contenido de la papeleta antes descrito es exclusivo y se originó en la Asamblea Legislativa. Art. 2 de la Ley habilitadora, *supra.*

DESDE SU ORACIÓN INTRODUCTORIA, LA LECTURA DEL ART. 2 DE LA LEY NÚM. 85, *SUPRA*, REFLEJA SERIOS DEFECTOS CONSTITUCIONALES. LA CUESTIÓN ES MEDULAR. ESTE ARTÍCULO CONTIENE LOS TÉRMINOS DE LAS SEIS (6) PROPUESTAS EN LA PAPELETA SOBRE LAS CUALES PASARÁ JUICIO EL ELECTOR. LA ASAMBLEA LEGISLATIVA HA INCURRIDO EN UN ACTO INCONCEBIBLE QUE ANULA EL USO DE ESA PAPELETA. COMO TÉCNICA, UTILIZA *ÚNICAMENTE* UN LENGUAJE *AFIRMATIVO*, QUE OFICIAL Y SUTILMENTE SUGIERE AL ELECTOR —CON CARÁCTER DE ÉNFASIS— UN SÓLO CURSO DE ACCIÓN, A SABER, "QUE SE PRESENTE AL PUEBLO DE PUERTO RICO *PARA SU APROBACIÓN* LA SIGUIENTE RECLAMACIÓN DE DERECHOS DEMOCRÁTICOS". (Énfasis suplido.) Anejo 2.

*DICHO DE OTRO MODO, LA LEGISLATURA DE ANTEMANO USÓ EN EL ART. 2 DE LA LEY NÚM. 85, SUPRA, UN LENGUAJE QUE DIRECTA Y EXPRESAMENTE PROMUEVE "SU APROBACIÓN".* Y ello, a pesar de que un referéndum, como consulta a la ciudadanía, por antonomasia, intrínsecamente es inseparable de dos (2) alternativas: *aprobación o rechazo.* Así lo ha reconocido siempre nuestro ordenamiento electoral. La Ley Electoral de Puerto Rico, en su Art. 1.003(50), según enmendado, 16 L.P.R.A. sec. 3003(50), define el referéndum como "el procedimiento mediante el cual se somete al electorado del Estado Libre Asociado de Puerto Rico la *aprobación o re-*

*chazo* de uno o varios asuntos de interés general". (Énfasis suplido.)

*LA CUESTIÓN NO ES MERA SEMÁNTICA*. La actuación de la Asamblea Legislativa ha permitido que durante el período de discusión de esta pieza legislativa, y en la campaña publicitaria ordenada en el Art. 7 de la Ley Habilitadora, *supra —a cargo de la Comisión Estatal de Elecciones—* se haya transcrito así *dicho texto* en los numerosos y cotidianos anuncios publicitarios en los periódicos principales del país —y otros medios de difusión— a página entera y en color amarillo. *EL MENSAJE OFICIAL GUBERNAMENTAL TRANSMITIDO DIRECTAMENTE AL ELECTORADO HA SIDO Y ES EMINENTEMENTE SUGESTIVO, ESTO ES, CON EL OBJETIVO DE INDUCIR E INFLUIR SUSTANCIALMENTE, EN LOS ELECTORES QUE VOTEN, LA APROBACIÓN.* A TRAVÉS DEL ART. 7 DE LA LEY NÚM. 86, LA ASAMBLEA LEGISLATIVA HA ASUMIDO ACTIVA E INDIRECTAMENTE UN ROL DE DIRIGISMO QUE NO LE CORRESPONDE.

La intervención oficial se ha prestado también a que en la campaña netamente partidista oriente (o desoriente) al elector a votar del lado *afirmativo*. El Gobierno intenta controlar y desplazar de ese modo la libre voluntad ciudadana. Incluso las opiniones de algunos analistas o politólogos publicadas en la prensa, carentes de suficiente objetividad y comprometidas más bien con determinada línea de pensamiento, hacen uso de y aprovechan esa técnica. Unimos al *Apéndice*, como *Anejo 2*, un facsímil fiel de uno de estos numerosos anuncios *oficiales*.

Hemos visto cómo el lenguaje del Art. 2 de la Ley Núm. 85, *supra*, es a los *únicos* efectos de que "[n]osotros, el pueblo de Puerto Rico, solemnemente *reclamamos* que se *garantice en nuestra Constitución*, los siguientes derechos democráticos ...". (Énfasis suplido.) Leyes de Puerto Rico, *supra*, pág. 809.

DE SU FAZ ES INTRÍNSECAMENTE DESORIEN-
TADOR, POR NO DECIR ENGAÑOSO. Si efectiva-
mente se trata de un verdadero *reclamo* —"pedir o
exigir con derecho ... una cosa"([6])— estamos también
ante unos escollos constitucionales insalvables. Ello
es incompatible con el Art. 3 de la citada Ley Núm.
85 que *cualifica su aprobación* —las razones las ex-
pondremos más adelante— a que simplemente ese
"reclamo al Gobierno de Puerto Rico [será] sobre la
*deseabilidad* a consagrarlos en la Constitución ...".
(Énfasis suplido.) Leyes de Puerto Rico, *supra*, pág.
810. EN TÉRMINOS JURÍDICOS, UNOS "RECLA-
MOS DE DERECHOS" DISTAN MUCHO DE SER
EJECUTADOS MEDIANTE SU "DESEABILIDAD".
Y ES QUE UN DERECHO QUE NO SE REALIZA
—EVOCANDO A IHERING— NO ES UN
DERECHO.

*ESTE MAL DE FONDO SE EXTIENDE A LA
PAPELETA.* AUNQUE EN ELLA APARECERÁ *"EL RE-
CLAMO"*, SE OMITE Y NO SE INFORMA AL ELECTOR
DEL TEXTO DEL ART. 3 DE LA LEY NÚM. 85, EXPOSI-
TIVO DE QUE SU VOTO Y ESE "RECLAMO AL GO-
BIERNO DE PUERTO RICO" VERDADERAMENTE
SÓLO ES "SOBRE LA *DESEABILIDAD* DE CONSA-
GRARLOS EN LA CONSTITUCIÓN". "Para que exista po-
der es necesaria la *eficacia*. Poder es querer con *eficacia.
Donde no hay voluntad para concebir y fuerza para ejecu-
tar no existe poder de especie alguna.* La voluntad sola sig-
nifica *un pensamiento estéril o un deseo ineficaz;* la fuerza,
también sola, supone un instrumento ciego, un acto de obe-
diencia pasiva." De Marino, *supra*, pág. 447.

Según expuesto, la propia Asamblea Legislativa recono-
ció en la Exposición de Motivos de la Ley Núm. 86, *supra*,

---

([6]). *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe,
1970, T. II, pág. 1113.

que no pudo contar con el endoso constitucionalmente requerido de dos terceras (⅔) partes de sus miembros para someter una consulta análoga. ¿CÓMO ENTONCES SE PRETENDE VÁLIDAMENTE CIRCUNVOLAR LA CONSTITUCIÓN, IGNORAR SUS REQUISITOS Y LLEVAR A CABO UN REFERÉNDUM *CON ESE MISMO EVENTUAL PROPÓSITO? LA CONSTITUCIÓN ADOPTÓ SABIAMENTE UNA SOLA FORMA;* LAS LEYES NÚMS. 85 Y 86 LA ALTERAN IMPERMISIBLEMENTE.

Al formular esta conclusión somos conscientes del argumento en contrario fundamentado en la tesis de que ahora no se está realmente enmendando la Constitución, sino sólo consultando "la deseabilidad" (Art. 3 de la Ley Núm. 85, *supra*) de si debe hacerse después. Esta contención es totalmente frívola. En *primer* lugar, el argumento acepta que la consulta no reúne los requisitos constitucionales y, por ende, *no es vinculante ni tiene ninguna eficacia enmendatoria.* Precisamente ahí radica su gran falla: *estamos ante una legislación fútil y trunca.* El resultado directo del Referéndum —de ser aprobado afirmativamente— *no obliga* a las presentes ni futuras Asambleas Legislativas a enmendar la Constitución. No tiene el elemento jurídico de autoejecutabilidad contenido en el Art. VII, Sec. 1 de nuestra Constitución, esto es, que "formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular". Const. E.L.A., *supra*, pág. 380.

*La Asamblea Legislativa conocía de esta total ausencia de eficacia jurídica ulterior, a saber, que no obliga a nadie.* Ello la movió a tratar de salvar este grave defecto. A tal efecto, en su Art. 3 *in fine*, la Ley Núm. 85, *supra*, dispuso que "[d]e ser aprobada por el pueblo, la Reclamación de Derechos Democráticos *sólo podrá ser modificada o revocada mediante una consulta* al pueblo y *no* podrá ser afec-

tada por el resultado de las elecciones generales". (Énfasis suplido.)

NO ES NECESARIA MUCHA REFLEXIÓN PARA PERCATARSE DEL ALCANCE QUE SE LE HA PRE-TENDIDO DAR AL RESULTADO FAVORABLE DE LA CONSULTA: *PERMANENCIA E INDEROGABILIDAD, EXCEPTO A TRAVÉS DEL PROCESO CIRCULAR DE OTRO REFERÉNDUM.* LA DIFICULTAD DE ESTA DIS-POSICIÓN ESTRIBA EN QUE INDUDABLEMENTE ES *ILEGAL Y NULA. EN NUESTRO PAÍS, LA ÚNICA FORMA DE PERPETUAR NORMAS JURÍDICAS DE ESE MODO ES ELEVARLAS A RANGO CONSTITUCIO-NAL Y SÓLO A TRAVÉS DE LOS MECANISMOS EN-MENDATORIOS ESPECIALES PROVISTOS EN LA MISMA CONSTITUCIÓN.*

Al respecto vale recordar tres (3) principios elementales. *Primero*, "la diferencia que existe entre una constitución y una ley. Aunque poseen rasgos parecidos, en el fondo hay una gran disimilitud: su majestuosidad e importancia. ... En evitación de cambios traumáticos, toda Ley Fundamental científicamente redactada ... *contiene su propia mecánica para fecundar y viabilizar el cambio: la cláusula de enmienda constitucional*[, Art. VII, Sec. 1, Const. E.L.A., *supra*]". *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 107–108 (1980). *Segundo*, "una legislatura no puede limitar el poder que tienen legislaturas posteriores para derogar, enmendar o aprobar las leyes". *Pueblo v. Tribunal de Distrito*, 70 D.P.R. 678, 681 (1949); *Mercado v. Mercado*, 66 D.P.R. 811, 817 (1947). Y *tercero*, que cuando "una ley es derogada deja de existir". *García Passalacqua v. Tribunal Electoral*, 105 D.P.R. 49, 59 (1976).

*La cuestión es tan sencilla y transparente que racionalmente no cabe otra conclusión.* La Asamblea Legislativa, ante la imposibilidad de lograr el mínimo de *consenso* constitucional requerido —dos terceras (⅔) partes de su composición total— *redactó y aprobó* la Ley Núm. 85, *supra*,

para someterla al electorado con *la misma finalidad: eventual enmienda constitucional.* De aprobarse afirmativamente, la Asamblea Legislativa tendría después que redactar otro proyecto de referéndum, *esta vez con el mínimo de consenso de dos terceras (⅔) partes,* y presentarlo nuevamente al electorado.

Estamos, pues, ante una ingeniosa forma o modalidad de iniciativa popular de enmienda *no autorizada por la Constitución.* Desnaturaliza la *seriedad y estabilidad del proceso democrático.* La Asamblea Legislativa no puede *supletoriamente* usarlo para —en un vicioso trámite circular— evadir *el consenso mínimo* constitucional *inicial y necesario de sus miembros.*[7]

Es evidente, pues, que el Art. 3, *in fine,* de la Ley Núm. 85, *supra,* da cualidad y efecto de cláusula constitucional —supra conmutativa y de permanencia— *a lo que en su origen no lo tuvo ni puede tener, aunque se apruebe el 8 de diciembre.* DE SU FAZ ESTAMOS ANTE UNA ACTUACIÓN LEGISLATIVA *ULTRA VIRES* E *INCONSTITUCIONAL* QUE ATENTA CONTRA SERIOS PRINCIPIOS DEMOCRÁTICOS FUNDAMENTALES. Despojada de todo atributo constitucional, la citada Ley Núm. 85 *simplemente es otro estatuto* —si bien de inmensa importancia— *jurídicamente ineficaz.* Contrario a lo que se pretende, tanto dicha ley como su ejecución son materia susceptible de ser enmendada ulteriormente en cualquier momento por la actual o futura Asamblea Legislativa.

---

[7] El legado de la Asamblea Constituyente es claro. El delegado Sr. José Trías Monge, al exponer el alcance del Art. VII, Sec. 1 de nuestra Constitución, *supra,* indicó que "estamos insertando en esta proposición de enmiendas, las *garantías esenciales a la estabilidad* de la Constitución, en cuanto se indica que *únicamente podrán proponerse enmiendas* a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes de los miembros que componen cada cámara. O sea, el *punto fundamental* es en cuanto a las *garantías de limitación a la etapa de iniciativa de* la enmienda a la Constitución". 3 Diario de Sesiones de la Convención Constituyente 1829 (1952).

Más adelante, en ocasión de defenderlo, señaló: "Estamos a favor y el sistema que se está estructurando en esta Constitución, es uno básicamente de democracia representativa; *no de democracia directa.*" Diario de Sesiones, *supra,* pág. 1832.

En resumen, sobre este aspecto —la "deseabilidad" (no reclamo) de elevar las propuestas a categoría constitucional— la Ley Núm. 85, *supra*, carece del don o cualidad necesaria de permanencia. Al decir de J. Xifra Heras, *Curso de Derecho Constitucional*, Barcelona, Ed. Bosch, 1957, T. 1, pág. 85, de un "empaque especial, una característica gracia declaratoria, o por mejor decir, definidora de lo que un pueblo quiere ser". Conforme la percepción de la Asamblea Constituyente, no tiene ni goza de "mayor autoridad, y dignidad". Diario de Sesiones, *supra*, T. 4, pág. 2559.

La consecuencia de este defecto es evidente. Sin dificultad alguna *revela dramáticamente el vicio de origen*. COMO TODA LA ESTRUCTURA LEGAL DE LA CONSULTA Y REFERÉNDUM ESTÁ FUNDAMENTADA EN LA CARACTERÍSTICA DE *PERMANENCIA* Y, SOBRE TODO, ASÍ SE LE HA COMUNICADO A LOS ELECTORES EN LOS NUMEROSOS ANUNCIOS OFICIALES, ES OBVIO QUE AL DECRETARSE SU INCONSTITUCIONALIDAD, POR IMPERATIVO, *CAE TODA LA PIEZA LEGISLATIVA*. No es posible separarla; queda trunco y sin eficacia *autoejecutable* el reclamo de los derechos sobre los cuales se pretende consultar al Pueblo.

Pero hay más. La ambigüedad e incertidumbre se manifiestan claramente al tomar conciencia de que se están sometiendo *ahora* seis (6) propuestas en *bloque*, diciéndole al Pueblo que vote sobre sus reclamos para, en el mañana, votar otra vez y lograr una enmienda constitucional. *Ello no es posible.*

Conforme el Art. VII, Sec. 1 de nuestra Constitución, *supra*, pág. 380, cualquier referéndum futuro para enmendarla está sujeto a que "[c]ada proposición de enmienda deberá votarse *separadamente* y *en ningún caso se podrá* someter *más de tres* proposiciones de enmienda en un *mismo referéndum*". (Énfasis suplido.)

Aquí, en la papeleta están agrupadas y nucleadas las

seis (6) propuestas de derechos que ahora se le pide al electorado que unitariamente vote. Si en el futuro referéndum de enmienda constitucional que presupone su aprobación *no pueden someterse todas simultáneamente*, ¿cuáles tres (3) serán escogidas por la Legislatura? El planteamiento no es prematuro. *Al electorado no se le consulta.* Estamos ante una *incertidumbre que incide en la raíz y validez del Referéndum* de 8 de diciembre, pues la voluntad del elector queda inconclusa. "[L]a ley no puede exigir cosas inútiles ni absurdas." *P.S.P. v. Com. Estatal de Elecciones*, 110 D.P.R. 400, 444 (1980). Ni siquiera en este extremo cumple la citada Ley Núm. 85 con el elemento *garantizador.*

No pasamos por alto la posibilidad de celebrar dos (2) referéndum. ¿Costo? Lo desconocemos. Sí sabemos que ninguno de esos posibles dos (2) futuros referéndum podría someterse "al mismo tiempo que la elección general siguiente": 1992. Después de todo, en la Exposición de Motivos de la Ley Núm. 85, *supra*, se plasmó —y así también se le ha informado oficialmente al electorado— la conveniencia de "separar estos asuntos de la discusión en las elecciones generales", Leyes de Puerto Rico, *supra*, pág. 809.

Es, además, inquietante que en términos expresos, sin siquiera haberse sometido la cuestión al electorado —y por ende, desconocerse si será o no aprobada— *con carácter de imprimátur oficial*, se haya concluido, en su Art. 3, que la Ley Núm. 85, *supra*, "es el sentir de la Asamblea Legislativa de Puerto Rico". Como acto consumado, ordena su remisión certificada y traducida al inglés para el Presidente y los miembros del Congreso de Estados Unidos. Art. 6 de la Ley Núm. 85, *supra.* En otras palabras, sin siquiera conocerse si será o no aprobada, ya la Asamblea Legislativa le dio trámite de *petición* ante el Congreso y el Presidente de Estados Unidos. Si ello es el "sentir de la Asamblea Legislativa", ¿para qué entonces consultar al electorado? No cabe otra conclusión: en su rápida promulgación, la Asamblea Legislativa *sobrecargó inconstitucionalmente* la

balanza tanto en favor del [SÍ] que *aclaró las consecuencias de un voto afirmativo, pero olvidó totalmente las resultantes de una desaprobación.* Como la citada Ley Núm. 85 nada dispone, ¿qué sucede si prevalece un rechazo?

Esta pregunta nos lleva a detectar otra *gran infracción constitucional*, pues " *'no hay alternativa válida* cuando la consulta es a favor o en contra de algo (o de alguien)' *y no está claramente establecido cuál será el efecto que producirá un pronunciamiento popular mayoritario en sentido negativo o adverso.* En los casos en que se practica este segundo tipo de consulta de antemano *el caso está presentado como una opción entre "sí" o "sí"* (José Reinaldo Vanossi, [Año XIV (Núm. 9) *Democracia Intermedia ¿Habrá Referéndum?* Panorama (1977)], pág. 36)". (Énfasis suplido.) J. Francisco Cholvis, *El Referéndum Consultivo: su Reglamentación,* 1985-A Rev. Jur. Arg. La Ley 713, 720 (1985).

La actuación de la Asamblea Legislativa de dejar sin establecer las consecuencias de un voto negativo es inexplicable. Ha dejado el asunto en manos de los argumentos y apreciaciones peculiares de los políticos, quienes dependiendo del "color del cristal con que lo miran", auspician y proponen su propia y particular interpretación. Olvida que un referéndum es el "procedimiento por el que se llama al cuerpo de ciudadanos a decidir sobre un acto público, generalmente de naturaleza normativa. Se manifiesta de ordinario como una decisión del cuerpo electoral en el proceso legislativo *de la que depende la eficacia o validez de la ley a que se refiere.* En todo caso, el referéndum constituye una manifestación del *autogobierno* del pueblo y refleja una desconfianza hacia los organismos representativos, pues a través de la colectividad realiza directamente una función pública". (Énfasis suplido y en el original.) Xitra Heras, *op. cit.,* págs. 393–394.

## VI

*Inconstitucionalidad del Referéndum como petición*

En cuanto a su carácter de *petición*, la Ley Núm. 85, *supra*, contiene otros serios defectos que constitucionalmente también anulan la consulta. Incide impermisiblemente sobre el derecho a la libre expresión y voluntad del elector. El mal constitucional es muy profundo: la defectuosa correlación recíproca entre el lenguaje de norma jurídica, la campaña oficial y la papeleta electoral. Trasciende defectos de redacción. Esta conclusión requiere una explicación breve.

En nuestro disenso en *Granados v. Rodríguez Estrada I*, 124 D.P.R. 1284 (1989), indicamos que en una democracia era "mandatorio aproximarnos al ideal de que el ejercicio del voto sea inteligente y reflexivo. *Es decir, es preciso que el derecho al sufragio se ejerza conforme al uso más elevado de las facultades individuales de cada ciudadano. Una democracia no puede apuntalarse en un ejercicio irresponsable, inconsciente o ignorante, sino sobre los fundamentos más esmerados de la razón, inteligencia y voluntad*". (Énfasis suplido.) Allí reconocimos *la importancia de las papeletas, su contenido e instrucciones*. Con visión indicamos: "*Se avecinan otros eventos electorales de importancia histórica para el país. Para legitimarlos más allá de nuestras playas corresponde a quienes ostentan el poder público honrar efectivamente el postulado democrático de igualdad humana en su expresión en las urnas*." (Énfasis en el original.) Íd., pág. 289.

El propósito del Referéndum de 8 de diciembre cae dentro de esa visión: consultar a los ciudadanos sobre seis (6) propuestas de derechos a "regir [en] cualquier consulta para variar nuestro status político". Sin embargo, no honra "el postulado democrático de igualdad humana en su expresión en las urnas".

Según indicado, la Asamblea Legislativa consideró de *especial importancia* los Arts. 3 y 5 de la Ley Núm. 85, *supra*, al extremo que *ordenó a la Comisión Estatal de Elecciones a reproducirlos textualmente en los medios de comunicación como parte de "su campaña de información y orientación"*. Art. 7 de la Ley Habilitadora, *supra*. Los Arts. 3 y 5 de la Ley Núm. 85, *supra*, disponen:

Artículo 3.—
Esta Ley de Garantía de Derechos Democráticos es el sentir de la Asamblea Legislativa de Puerto Rico. La Reclamación de Derechos Democráticos aquí contenida constituye un reclamo al Gobierno de Puerto Rico *sobre la deseabilidad a consagrarlos en la Constitución del Estado* Libre Asociado de Puerto Rico y una Petición al Congreso y al Presidente de los Estados Unidos para que estos derechos sean respetados al actuar sobre nuestro status político. *De ser aprobada por el pueblo, la Reclamación de Derechos Democráticos sólo podrá ser modificada o revocada mediante una consulta al pueblo y no podrá ser afectada por el resultado de las elecciones generales.*

Artículo 5.—
Las alternativas de Estado Libre Asociado y Estadidad incluidas en la Reclamación de Derechos Democráticos que se presentará al pueblo el 8 de diciembre de 1991 *son formas de "status" de unión permanente con los Estados Unidos.*
*La Reclamación de Derechos Democráticos no es una reclamación de cambio de "status". El resultado del referéndum no se interpretará a favor ni en contra de cualquier alternativa de status o partido político. Tampoco se interpretará como una petición de separación, ni de modificación del presente "status", ni del uso de las dos banderas, los dos himnos y los dos idiomas como dispone nuestro ordenamiento jurídico.* (Énfasis suplido.)
Leyes de Puerto Rico, *supra*, pág. 810.

Otra vez advertimos que en la papeleta electoral no se someten al electorado —*ni aparecen*— esos extremos y asuntos germanos, *inextricablemente* atados a las seis (6) propuestas de derechos, y con las alternativas de *status* político.

Aunque en su Art. 5 la Ley Núm. 85, *supra*, reconoce que el Estado Libre Asociado y la Estadidad "son formas de

status de unión permanente con los Estados Unidos", *ello no se dice en la papeleta*. De igual modo, *se omiten de la papeleta* otros importantes elementos y pronunciamientos, algunos inexorablemente vinculados a las seis (6) propuestas de derechos democráticos reclamados. *La Asamblea Legislativa dejó fuera de la papeleta* —y los electores *no serán consultados ni podrán votar*— sobre: (1) que la reclamación no es un "cambio de 'status' "; (2) que el "resultado del referéndum no se interpretará a favor ni en contra de cualquier alternativa de status o partido político", y (3) que no "se interpretará como una *petición* de separación, ni de modificación del presente 'status', ni del uso de las dos banderas, los dos himnos y los dos idiomas como dispone nuestro ordenamiento jurídico". (Énfasis suplido.) Leyes de Puerto Rico, *supra*, pág. 810.

El [SÍ] o el [NO], como adverbios afirmativo y negativo excluyentes entre sí, representan las formas más drásticas y extremas de comunicar asentimiento o rechazo. En lógica, tiene que ser producto del juicio, esto es, de una "operación de entendimiento". Implica "la comparación de dos ideas para conocer y determinar sus relaciones". *Diccionario de la Lengua Española*, 20ma ed., Madrid, Ed. Espasa-Calpe, 1970, T. II, pág. 774. En justicia electoral, significa que las seis (6) propuestas a someterse al electorado *deben también poseer una correlación recíproca exacta entre la citada Ley Núm. 85 y la papeleta. No la hay.*

Al respecto, por su condición dual de figura de relieve e importancia pública —Gobernador y Presidente del Partido Popular Democrático (P.P.D.)— citamos las pertinentes palabras del codemandado, Hon. Rafael Hernández Colón: "Las urnas serán la voz de ustedes. Yo les pido a todos que cuando estén allí, *sólo con su conciencia lean lo que dice esta papeleta, lean lo que representa el SI y lean lo que representa el NO* y a tono con su *conciencia* tomen la decisión que corresponda ...". *El Nuevo Día*, San Juan, jueves 7 de noviembre de 1991, pág. 18; participación de un panel

sobre el Referéndum en el Programa *Controversial* de Carmen Jovet, Canal 11.

*La papeleta nada dice de lo que representa el [NO]*. Preguntamos, ¿cómo es posible que se pretenda obtener una votación legítima —inteligente, informada y reflexiva— del electorado en "conciencia" si los anteriores extremos y elementos no forman parte de la consulta ni se incluirán en la papeleta? Si la Ley Núm. 85, *supra*, manda que la "papeleta expres[e] que [la] reclamación constituye una petición al Congreso y al Presidente de los Estados Unidos" (Art. 4 de la Ley Núm. 85, Leyes de Puerto Rico, *supra*, pág. 810), *¿qué justificación legal hay —por no decir racional— para que la Asamblea Legislativa haya omitido incluir en la papeleta precisamente las condiciones que cualifican y afectan sustancialmente el Referéndum en sus dos (2) vertientes: consulta y petición?*

*EVIDENTEMENTE, LA LEY NÚM. 85, SUPRA, CONTIENE UNAS LAGUNAS QUE A PRIORI AFECTAN LA PUREZA, LEGITIMIDAD Y CONFIABILIDAD DE SUS RESULTADOS. EXISTE UN INSALVABLE ABISMO ENTRE LOS PRONUNCIAMIENTOS DE SU EXPOSICIÓN DE MOTIVOS, EL TEXTO DE LEY, LA IMPLANTACIÓN DE LA CAMPAÑA OFICIAL Y LA PAPELETA. ¿CÓMO NEGAR QUE ESAS OMISIONES VERSAN SOBRE "CUESTIONES FUNDAMENTALES QUE DEFINEN EL FUTURO POLÍTICO DE UNA SOCIEDAD"?*

Hasta los más avezados políticos o juristas se ven confundidos frente a propuestas que se presentan de una manera y resultan ser de otra. ¿Qué dejaremos para el lego, ciudadano promedio o humilde analfabeta? *Si el Pueblo no será consultado* de que *no* es una "reclamación de cambio de *status*"; *si el Pueblo no será consultado* de que las alternativas de *status* E.L.A. y estadidad son "formas de *status* de unión permanente con los Estados Unidos"; *si el Pueblo no será consultado* de que el resultado "no se interpretará a favor ni en contra de cualquier alternativa de status o

partido político"; *si el Pueblo no será consultado* de que su voto *no* "se interpretará como una petición de separación"; *si el Pueblo no será consultado* de que su voto *no* se interpretará como una "modificación del presente *status*"; *si el Pueblo no será consultado* de que su voto *no* se interpretará como una modificación "del uso de las dos banderas"; *si el Pueblo no será consultado* de que su voto *no* se interpretará como una modificación el uso de "dos himnos"; *si el Pueblo no será consultado* de su voto *no* se interpretará como una modificación al uso de "los dos idiomas como dispone nuestro ordenamiento jurídico" (Leyes de Puerto Rico, *supra*, pág. 810), ¿puede sostenerse seriamente que todos estos extremos, íntimamente relacionados con el *status* y las propuestas —conforme la Exposición de Motivos de la Ley Núm. 85— van a "ser refrendadas por el voto directo del Pueblo"? OBVIAMENTE NO.

*El asunto es trascendental en el ámbito constitucional.* Y es que la validez de un referéndum "depende no sólo de la universalidad del sufragio, sino de la medida en que los electores *participan de hecho en la votación*". (Énfasis suplido.) Cholvis, *supra*, págs. 720–721. *Hemos visto que ningún elector habrá de participar realmente en torno a esos importantes extremos.* Decimos importantes pues, de lo contrario, ¿por qué la Asamblea Legislativa los incluyó en la ley y expresamente ordenó a la Comisión Estatal de Elecciones que en su campaña oficial los reprodujera *con* las seis (6) propuestas de derechos?

LO ÚNICO QUE TENDRÁ ANTE SÍ ESE ELECTOR, RECEPTOR DE TODA ESA DESINFORMACIÓN OFICIAL, ES UNA *PAPELETA CONFUSA, INCOMPLETA Y ENGAÑOSA.* No puede subestimarse la situación. La omisión de estos extremos imbricados a las seis (6) propuestas va a la *esencia y legitimidad* de la misma consulta y, por ende, al corazón de una verdadera democracia en acción. *En todo referéndum, la labor de formular las preguntas a los ciudadanos es muy delicada, "porque sus términos pue-*

*den condicionar notablemente el resultado*. Si la consulta popular no se formula y ejecuta debidamente puede quedar reducida *a una mezquina y poco seria maniobra política*. Es sabido que las formas de participación directa del pueblo, para que sean eficaces, *presuponen en él una opción clara sobre los problemas que se someten a su decisión* ... es necesario que el sentido de la consulta responda a dos características inexcusables: a) cuando la consulta debe ser evacuada por el pueblo con un 'sí' o con un 'no' *en ambos casos* los *resultados* deben ser *igualmente operativos* (es decir, *que el 'no' está distante de conllevar un salto en el vacío*), y b) que en los casos en que la consulta se halla formulada en términos de una opción o alternativa entre *dos caminos, cualquiera de ellos debe conducir a un punto* —institucionalmente hablando—, sin que el pronunciamiento en favor de uno u otro pueda llevar *a un callejón sin salida* (Conf. Jorge Reinaldo Vanossi, 'Democracia intermedia. ¿habrá referéndum?'; Panorama-febrero 1977, Año XIV, núm. 9, p. 36)". (Énfasis suplido.) Cholvis, *supra*, pág. 720.

## VII

*Otros defectos visibles en la papeleta*

En toda comunicación hay un emisor que envía un mensaje y un receptor que lo recibe. Distinto a otros, en este Referéndum no se proveen *símbolos o figuras geométricas* para identificar las propuestas y atender la emisión de votos por aquel sector de ciudadanos que lamentablemente están sumergidos en la obscuridad del analfabetismo. Es chocante que la Asamblea Legislativa haya actuado así en contravención de la admonición constitucional de que "[n]adie será privado del derecho al voto por no saber leer o escribir ...". Art. VI, Sec. 4., Const. E.L.A., *supra*, pág. 367. No puede argumentarse que bastan los encasillados [SÍ] o

[NO]. Si así fuera, ¿qué de los textos escritos de las seis (6) propuestas? Recordemos lo dicho por Biondi. El absurdo jurídico no es el absurdo lógico, *es lo injusto.* Por lo demás, creo que cuando un absurdo, una injusticia se da, *el absurdo jurídico es absurdo lógico también. Villanueva v. Hernández Class,* supra.

Cobra más relieve entonces que "el Estado moderno tiene la función inexcusable de *educar.* Es pertinente recordar que a las urnas acuden por igual, *con el mismo derecho,* analfabetos y profesionales, gente medianamente instruida y otros que han alcanzado niveles más especializados de conocimiento. El universo es amplio. También se compone de personas de edad avanzada, retraídos y tímidos. *La educación, pues, es clave y se impone como medio que asegure, repetimos, que el acto de votar represente una manifestación de sensatez y de prudencia en el sentido más elevado de la palabra".* (Énfasis suplido y en el original.) *Granados v. Rodríguez Estrada I,* supra, pág. 284.

Ello nos lleva nuevamente a concentrarnos en la campaña publicitaria oficial de la Comisión Estatal de Elecciones y la de anuncios de organismos gubernamentales.

## VIII

*Ilegalidad en campaña publicitaria oficial de la Comisión Estatal de Elecciones*

En nuestra opinión concurrente en *P.N.P. v. Hernández, Srio. D.T.O.P.,* 122 D.P.R. 362, 388–389 (1988), aceptamos la realidad de que las "agencias de publicidad cuentan con expertos conocedores de la conducta humana. Ideas, imágenes, detalles visuales y gráficos aparentemente *insignificantes pueden esconder solapadamente un mensaje político.* Por lo tanto, no podemos abstraernos de los adelantos de la industria de las comunicaciones y del desarro-

llo de complejas técnicas para encubrir mensajes. *Así, po-dría sustituir la burda y repudiada práctica de la compra del voto por una refinada fórmula que penetra el incons-ciente del elector.* De esta manera, un ingenioso anuncio radial o televisivo puede ser una fina argucia para encubrir un mensaje político-partidista". (Énfasis suplido.)

" 'Los Jueces no viven en un vacío. Sabemos lo que el resto de la comunidad sabe.' *Pueblo v. Marrero*, 79 D.P.R. 649, 658 (1956). A fin de cuentas, 'nuestro papel, aunque limitado, no se desarrolla en un *vacío.* Cuando los hechos son suficientemente abrumadores, hasta los tribunales pueden tomar conocimiento judicial de los mismos, y de ese modo evitar en parte la censura expresada por Bentham al efecto de que el arte de la jurisprudencia consiste en des-conocer metódicamente lo que todo el mundo sabe'. (Énfa-sis suplido.) *Ballester v. Tribunal de Apelación*, 61 D.P.R. 474, 507-508 (1943)." *Noriega v. Gobernador*, 122 D.P.R. 650, 696 (1988), opinión de conformidad.

La forma *subliminal* de anuncios ilegales oficiales ha penetrado la estructura de la Comisión Estatal de Elecciones. Dicho organismo, por conducto de su agencia de publicidad, escogió en su símbolo, como distintivo, el color amarillo *para atraer la atención del elector hacia "un mensaje importante".* Anejo 3; precisamente el mismo color escogido por los proponentes del [SÍ] para sus logos de campaña. Aparte del anuncio mencionado al inicio de esta ponencia (Anejo 2), hay dos (2) anuncios de la Comisión Estatal de Elecciones publicados en múltiples ocasiones en que se ha intercalado una composición de lenguaje que tiene *el propósito de promover sutilmente un voto afirmativo.* Comienza así: *"VOTAR* ES LA MANERA MÁS CLARA DE *EJERCER SIN NINGUNA LIMITACIÓN TUS DERECHOS DEMOCRÁTICOS.* NO DESPERDI-CIES ESTA OPORTUNIDAD DE *EXPRESAR* TU PENSAMIENTO. EL 8 DE DICIEMBRE ¡VOTA EN EL REFERÉNDUM!" Anejo 4.

Con igual carácter subliminal apreciamos el anuncio siguiente:

"VOTA. LA CLAVE PARA QUE *LA DEMOCRACIA FUNCIONE PLENAMENTE* ES QUE CADA UNO DE SUS CIUDADANOS *EJERZA SUS DERECHOS*. EL 8 DE DICIEMBRE ¡VOTA EN EL REFERÉNDUM!" Anejo 5.

## IX

*Ilegalidad manifiesta de la campaña publicitaria gubernamental; aplicación de prohibición; procedencia del "mandamus" contra la Comisión Estatal de Elecciones*

En este aspecto también aflora "trágicamente, el rostro de la figura patológica de la *partidocracia* como anatema de una verdadera *democracia*". (Énfasis en el original.) *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, pág. 377.

Y es que la "regla de oro de las democracias contemporáneas radica en la convicción generalizada acerca de la posibilidad competitiva para la accesión al poder, sólo y *únicamente cuando los más vastos sectores sociales de una comunidad comparten la creencia cierta en torno a la viabilidad de la disputa según las 'reglas del juego'*, entonces el régimen goza de la perspectiva de un *consenso en grado de legitimidad*, que asegura la deposición de la conjura para la inserción de las mayorías en la leal adversidad. Que el sentimiento de los triunfos y de las derrotas no asuma la proporción de un dato de inapela-bilidad en el futuro, es fundamental para que la democracia permita la repetición del *acto verificatorio del consenso*, en el cual los derrotados de ayer puedan convertirse en los triunfadores de hoy, y donde los gananciosos del presente puedan trocarse en los perdidosos del mañana". (Énfasis suplido.) J. Reinaldo Vanossi, *Los partidos políticos y los presupuestos de la democracia*, 1988-D Rev. Jur. Arg. La Ley 1287, 1290 (1980).

Al igual que lo hicimos en *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, págs. 385–386, reafirmamos que el "derecho es vivo y toma cuerpo de la dinámica del entretejido social. *Tomamos conocimiento judicial de que recientemente, a pocas semanas [del referéndum]*, diversas agencias han comenzado a publicar anuncios masivos —a título de información de interés general— de ostensible tamaño y mensaje elaborado. *El incremento en anuncios es notable y coincide con la plena campaña partidista*". (Énfasis suplido.)

La Ley Electoral, en su Art. 8.001 (16 L.P.R.A. sec. 3351), *prohíbe terminantemente* que con fondos públicos, durante el año electoral, el Gobierno y sus agencias anuncien —directa o indirectamente— en los medios de difusión sus logros y proyectos. Por su parte, el Art. 20 de la Ley Habilitadora, *supra*, dispone que "[a]demás de las prohibiciones antes mencionadas, *regirán en toda su fuerza y vigor* las disposiciones sobre *prohibiciones* y delitos establecidos en la Ley Electoral de Puerto Rico que sean *necesarios, pertinentes y aplicables a los propósitos de esta ley*". (Énfasis suplido.) Leyes de Puerto Rico, *supra*, pág. 818. Es clara, pues, su aplicabilidad y que la Comisión Estatal de Elecciones ha faltado a su deber de ejecutar y poner en vigor ese mandato legal. La expedición del *mandamus* para remediar esta situación es evi-dente e imposponible. El *mandamus* quedaría complementado con una orden de *injunction* dirigida contra las restantes agencias codemandadas y otros paralizando tales anuncios. *Cualquier demora torna ilusorio el imperio de la ley.*

En nuestro disenso en *P.P.D. v. Junta Revisora Electoral*, 109 D.P.R. 464, 467 (1980), profundizamos así sobre esta prohibición estatutaria:

... [P]lasma un principio de alta moralidad en la administración pública, e intenta lograr los siguientes objetivos: (a) directamente, evitar que las agencias gubernamentales usando fondos públicos y so pretexto de exponer sus ejecutorias o planes,

realicen solapadamente campaña política en favor del partido en el poder y aquellos incumbentes que aspiran nuevamente a ser electos; (b) reducir las ventajas reconocidas que gozan los candidatos incumbentes —a través del acceso a los electores y público en general por medio de la televisión, prensa y radio— que el solo ejercicio y exposición del cargo conlleva sobre sus opositores; y (c) indirectamente, frenar los excesos y economizar el erario público y a los contribuyentes los gastos ordinarios de publicidad en año de elecciones.

Estos pronunciamientos se dieron en contra de un anuncio durante un año electoral. Sin embargo, es obvio que aparte de los principios de alta moralidad pública que inspiran la prohibición del Art. 8.001 de la Ley Electoral de Puerto Rico, *supra*, la Constitución y un sentido de lo que es el "juego justo electoral" nos llevan racionalmente a determinar que *aplican al proceso del Referéndum*. Esta interpretación se nutre además, según hemos visto, en que la Ley Habilitadora, en su Art. 5, *supra*, considera supletoria la Ley Electoral de Puerto Rico y sus reglamentos en todo ·aquello "necesario, pertinente y compatible".

La única distinción que puede hacerse entre unas elecciones generales y este Referéndum es que en la pri-mera se eligen candidatos a puestos públicos y en el se-gundo se vota afirmativa o negativamente sobre seis (6) propuestas de derechos. Ello no varía *la naturaleza fundamental común* de los eventos: en *ambos se ejercita el sufragio electoral y, por ende, la Asamblea Legislativa viene obligada a "garantizar"* que esté libre de coacción.

Bajo nuestra Constitución, la igual protección de las leyes y el derecho a la libre expresión prohíben el expendio de fondos públicos para propaganda política, directa o indirectamente. Ante ese linaje constitucional, aun cuando las citadas Leyes Núms. 85 y 86 "guardara[n] silencio al respecto, subsistiría *el principio igualitario constitucional de que los desembolsos públicos para fines de propaganda política no son lícitos ni tolerables. Ante reclamos meritorios, los tribunales tienen la facultad inherente para impe-*

*dir, reivindicar y remediar infracciones a ese derecho*. Después de todo, '[a]l presente, en materia electoral no se cuestiona seriamente el postulado de igualdad inmerso en nuestra Constitución. Históricamente ese ideal ha cobrado vida en el esquema integral financiero trazado por la Asamblea Legislativa para lograr paridad económica entre los partidos políticos y los candidatos'. *Marrero v. Mun. de Morovis*, 115 D.P.R. 643, 646 (1984); *P.S.P. v. Srio. de Hacienda*, [110 D.P.R. 313, 327 (1980), opinión concurrente]". *P.N.P. v. Hernández, Srio. D.T.O.P.*, supra, pág. 370.

A estas alturas, nadie debería discutir que la "corrupción y el desembolso indebido o ilegal de fondos públicos —en sus formas múltiples, a veces burdas y otras sofisticadas— son actos incompatibles *con el sistema de gobierno democrático consagrado en nuestra Constitución y apuntalado en el respeto a la dignidad humana y los dineros del pueblo como único soberano*. No importa las modalidades que adopten ni la jerarquía del funcionario involucrado; las mismas son intolerables. *En última instancia, quien verdaderamente se perjudica, no sólo en lo económico sino en lo moral, es la ciudadanía en general independientemente de su afiliación política. Es, pues, obligación de los tribunales reivindicar esos valores fundamentales*". *A.E.E. y A.A.A. v. P.N.P.*, 128 D.P.R. 294, 294–295 (1991), voto concurrente, al cual se unieron los Jueces Asociados Señores Rebollo López y Andréu García.

Esta conclusión no es simplemente una opinión individual. Tan reciente como el pasado 11 de noviembre la Comisión Estatal de Elecciones aprobó con unanimidad el Reglamento de Gastos de Difusión Pública del Gobierno. Veamos lo que nos dice al respecto su *Declaración de Propósitos:*

> *La Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho al sufragio universal de cada ciudadano en todos los procesos electorales que le rigen con arreglo a los dictados de su conciencia y libre de toda coacción.*

Este Reglamento tiene como propósito el reglamentar la prohibición sobre los gastos para la compra de tiempo y espacio en los medios de difusión pública, así como de otros medios de difusión, según se define en el mismo de las Agencias del Gobierno de Puerto Rico, la Asamblea Legislativa y la Rama Judicial a partir del *1ro. de enero del año en que se celebren las elecciones generales* y hasta el día siguiente a la fecha de celebración de la misma, a los fines de evitar la divulgación publicitaria indiscriminada con el propósito de exponer sus programas, proyectos, logros, realizaciones, proyecciones o planes del gobierno que *en alguna forma coaccionen o afecten la voluntad de los electores.* (Énfasis suplido.) Reglamento de Gastos de Difusión Pública del Gobierno, Sec. 1.2, pág. 1.

¿Puede sostenerse que el Referéndum no es un pro-ceso electoral que requiere que el sufragio se emita con-forme la voz de la conciencia "y libre de toda coacción"?([8]) ¿Puede negársele filiación constitucional a la prohibición de anuncios gubernamentales?

La fuente para sostener el *mandamus* contra los miembros de la Comisión Estatal de Elecciones y la prohibición al uso y abuso de fondos públicos en anuncios gubernamentales durante el proceso prereferéndum contra los otros codemandados, es el axioma de *igualdad* inmerso en la Constitución. Es unánime la crítica o señalamiento de que una de las fallas mayores en todo referéndum es su "suscepti[bilidad] de ser *manejado con presiones y propaganda más fácilmente* que el procedimiento de una votación por una asamblea representativa, y por ello ha sido y es empleado por regímenes autocráticos en procura de legitimidad; de ello hay sobrados ejemplos". (Énfasis suplido.) Padilla, *supra*, pág. 926. *"Su mayor inconveniente es la tendencia que implica a la demagogia."* (Énfasis suplido.) Sánchez Agesta, *op. cit.*, pág. 290.

El clima creado con la campaña de publicidad ilegal y,

---

([8]) El argumento en contrario es tan frágil y arbitrario como la "magia" de la fecha fijada para el Referéndum. Si hubiese sido un (1) mes más tarde —7 de enero de 1992— ¿aplicaba la prohibición de gastos? Obviamente sí.

por qué no decirlo, INMORAL, del Gobierno *vicia* irremediablemente de antemano los resultados del Referéndum.

Es una muestra de inmadurez política que debilita la democracia. "Es hora de desterrar de nuestro suelo la *PARTIDOCRACIA, esto es, la creencia de que el Gobierno y el partido político mayoritario son una misma cosa. De acuerdo con nuestra Constitución, es axiomático que si la conducta en la cual incurrió es ilegal o atenta contra las sanas normas jurídicas o administrativas vigentes para el mejor desembolso de fondos públicos*, ni la lealtad de un ciudadano —incluso la de los funcionarios públicos hacia su partido político— ni la obediencia jerárquica son defensas válidas." (Énfasis suplido.) *A.E.E. y A.A.A. v. P.N.P.*, supra, pág. 299. Estamos ante un *enriquecimiento injusto* (íd.), pues la nociva práctica incre-menta sustancialmente las arcas del partido que controla el Gobierno, más allá de los límites de las asignaciones autorizadas en el Fondo Electoral.

## X

### Conclusiones

Los textos de las Leyes Núms. 85 y 86, *supra*, y su implantación *son el compendio opuesto a las garantías constitucionales y a la deseable claridad de toda norma jurídica necesaria para legitimar el Referéndum.* La palabra es la revelación y manifestación de la realidad como sentido más elevado del lenguaje. En las dos leyes, la Asamblea Legislativa omitió elementos intrínsecos inseparables de varias propuestas de la consulta. *El producto es que en las urnas el próximo 8 de diciembre el ciudadano transite por sendas erróneas y confusas.* No hay concordancia entre el uso del lenguaje legal, la campaña oficial y la papeleta; *irónicamente el impacto es una deformación del fin democrático que se aspira alcanzar.* Se ha creado un cristal encubridor

que directamente pone en peligro la validez de la consulta. Brillan por su ausencia unos derechos y elementos inherentes al voto inteligente y cabal.

CON TODA LA DEFERENCIA QUE MERECEN LOS PODERES LEGISLATIVO Y EJECUTIVO, DE CELEBRARSE EL REFERÉNDUM SEGÚN LAS REFERIDAS LEYES NÚMS. 85 Y 86, SE LE ESTARÁ SOMETIENDO AL PUEBLO UN EJERCICIO ELECTORAL ESTÉRIL. SERÁ UNA CONSULTA TRUNCA, INCOMPLETA, CON UNA PAPELETA CONFUSA,CONTRADICTORIA Y ENGAÑOSA. EN SUS EXTREMOS BÁSICOS, EL REFERÉNDUM CARECE DE LAS GARANTÍAS NECESARIAS. LEJOS DE HONRAR LOS POSTULADOS DE UNA VERDADERA DEMOCRACIA Y EDUCAR, LA CAMPAÑA OFICIAL ATENTA CONTRA LA VOLUNTAD DEL ELECTOR.[9]

A modo de preámbulo, vale recordar que una "Constitución no es sólo un conjunto de normas, sino un sistema de valores plenos de contenido histórico y político. Cuando no se entiende así, sirviendo a esos valores, *sino haciendo de cada norma un sofisma para falsificar la realidad política*, estamos haciendo en la semántica constitucional un fin en sí mismo ...". (Énfasis suplido.) A.E. Mooney, *La elección del poder Ejecutivo nacional (legalidad versus legitimidad)*, 1985-E Rev. Jur. Arg. La Ley 545, 548 (1985).

Somos conscientes de que *"DECLARAR INCONSTITUCIONAL UN ESTATUTO ES LA SOLUCIÓN JUDICIAL MÁS EXTREMA EN NUESTRO SISTEMA DE GOBIERNO DE FRENOS Y CONTRAPESOS*. Véanse: *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 618-619 (1981); *Negrón Soto v. Gobernador*, 110 D.P.R. 664, 678–679 (1981);

---

[9] La Constitución prohíbe "que las leyes electorales den lugar, por ausencia de las garantías necesarias al brote de temores fundados, *dudas razonables* o *riesgo real* de que *la pureza del proceso eleccionario pueda efectuarse sensiblemente.*" *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 281 (1980), opinión disidente del Juez Presidente Señor Trías Monge.

*E.L.A. v. Aguayo*, 80 D.P.R. 552, 596 (1958)". (Énfasis en el original.) *Lasso v. Iglesia Pent. La Nueva Jerusalem*, 129 D.P.R. 219, 239 (1991), opinión concurrente. Lamentablemente, ante la magnitud y multiplicidad de defectos constitucio-nales de las citadas Leyes Núms. 85 y 86, no es posible aplicar esta prudencial norma de autorrestricción. Sería un fracaso de la justicia.

*Y es que sin restricciones al uso masivo y abusivo de fondos públicos para la intensa campaña publicitaria en favor de un gobierno que oficialmente ya endosó la alternativa del [SÍ] en el Referéndum; sin la Comisión Estatal de Elecciones proveerle al elector claridad en cuanto al alcance de su voto; sin haber descargado fielmente su función educativa, sino por el contrario "orientado" también hacia el voto afirmativo; sin incluirse en la papeleta la información mínima de todos los elementos que la Legislatura estimó cualifican las seis (6) propuestas de derechos; sin permitírsele al elector votar separadamente, y sobre todo, sin una aclaración legislativa del significado de un voto negativo, "el fragilísimo barniz de legitimidad que en hipótesis semejantes pueda aportar el referéndum, no engaña en estos tiempos a nadie, salvo a quienes acepten ser engañados".* Padilla, *supra*, pág. 926.

Ignorar todos estos señalamientos nos recuerda a los habitantes de *Macondo*. Muchos pueden —según el magistral verbo de Gabriel García Márquez en *Cien Años de Soledad*— "continuar ... viviendo, una realidad escurridiza, momentáneamente capturada por las palabras, pero que había de fugarse sin remedio *cuando olvidaron los valores*

*de la letra escrita"* y —¡por qué no decirlo!— *del espíritu de la Constitución.*(¹⁰)

---

(¹⁰) Fieles a ese espíritu, en *P.I.P. v. C.E.E.*, 120 D.P.R. 580, 630 (1988), disentimos también vigorosamente contra la decisión *injusta* de convalidar el uso de fondos públicos en las primarias presidenciales. En cuanto a la fórmula conciliatoria política acuñada oficialmente en la frase *Estado Libre Asociado* dijimos:

"Más allá de sus voces gramaticales, esta frase es la combinación histórica de los sentimientos vivos tripartitas ideológicos que se respetaron y quedaron incrustados en la Constitución. Debe recordarse —y merece repetirse— que, en palabras de Luis Muñoz Marín, Presidente de la *Comisión de Preámbulo, Ordenanzas y Procedimientos de Enmiendas a la Constitución,* 'no *significa república, ni estado independiente y separado; tampoco estado de la Unión'.* En materia de *status,* su naturaleza es *neutral,* esto es, 'ni *excluye* ni *implica* la estadidad federada, la independencia separada u otra forma de organización política a que nos pueda conducir nuestra voluntad y destino'. (Énfasis suplido y en el original.) 4 Diario de Sesiones de la Convención Constituyente 2555 y 2557 (1951)."

Como resolvimos en *P.S.P. v. E.L.A.,* 107 D.P.R. 590, 606 (1978) —por voz del ex Juez Presidente Señor Trías Monge— la "Constitución del Estado Libre Asociado quiso diseñar un esquema que dejase libre a todo ciudadano para propulsar y defender sus propias ideas sobre el destino final de nuestro pueblo. *No puede invocarse la Constitución de Puerto Rico como apoyo para paso alguno que incline o aparente inclinar la balanza, a juicio de otros sectores de opinión, hacia determinado tipo de status".* (Énfasis suplido.)

# APÉNDICE

## Anejo 1

**Referéndum para la aprobación o rechazo del electorado de la Reclamación de Derechos Democráticos aprobada por la Asamblea Legislativa de Puerto Rico.**

| Voto a favor de la Reclamación de Derechos Democráticos. | Voto en contra de la Reclamación de Derechos Democráticos. |
|---|---|
| # SI | # NO |

Nosotros, el Pueblo de Puerto Rico, solemnemente reclamamos que se garantice en nuestra Constitución, los siguientes derechos democráticos:

- el derecho inalienable a determinar libre y democráticamente nuestro status político
- el derecho a escoger un status de plena dignidad política sin subordinación colonial, ni territorial, a los poderes plenarios del Congreso
- el derecho a votar por las tres alternativas de status Estado Libre Asociado, Estadidad e Independencia, fundamentadas en la soberanía del Pueblo de Puerto Rico
- el derecho a que la alternativa triunfante en una consulta de status requiera más de la mitad de los votos emitidos
- el derecho a que toda consulta sobre status garantice, bajo cualquier alternativa, nuestra cultura, idioma e identidad propia, que incluye nuestra representación deportiva internacional
- el derecho a que toda consulta sobre status garantice, bajo cualquier alternativa, la ciudadanía americana que salvaguarda la Constitución de los Estados Unidos de América.

Esta Reclamación constituye un reclamo al Gobierno de Puerto Rico para que estos derechos se consagren en la Constitución del Estado Libre Asociado de Puerto Rico y una petición al Presidente de los Estados Unidos y al Congreso para que estos derechos sean respetados al actuar sobre nuestro estatus político.

COMISION ESTATAL DE ELECCIONES
*8 DE DICIEMBRE DE 1991*

## Anejo 2

### Información importante del Referéndum

De la LEY NUM. 85 del 17 de septiembre de 1991:

Artículo 2.- Se dispone que se presente al Pueblo de Puerto Rico para su aprobación la siguiente Reclamación de Derechos Democráticos:

"Nosotros, el Pueblo de Puerto Rico, solemnemente reclamamos que se garantice en nuestra Constitución, los siguientes derechos democráticos:

- el derecho inalienable a determinar libre y democraticamente nuestro status político

- el derecho a escoger un status de plena dignidad política sin subordinación colonial, ni territorial, a los poderes plenarios del Congreso.

- el derecho a votar por las tres alternativas de status; Estado Libre Asociado, Estadidad e Independencia, fundamentadas en la soberanía del Pueblo de Puerto Rico.

- el derecho a que la alternativa triunfante en una consulta de status requiera más de la mitad de los votos emitidos

- el derecho a que toda consulta sobre status garantice, bajo cualquier alternativa, nuestra cultura, idioma e identidad propia, que incluye nuestra representación deportiva internacional

- el derecho a que toda consulta sobre status garantice, bajo cualquier alternativa, la ciudadanía americana que salvaguarda la Constitución de los Estados Unidos de América"

Artículo 3.- Esta Ley de Garantía de Derechos Democráticos es el sentir de la Asamblea Legislativa de Puerto Rico. La Reclamación de Derechos Democráticos aquí contenida constituye un reclamo al Gobierno de Puerto Rico sobre la deseabilidad a consagrarlos en la Constitución del Estado Libre Asociado de Puerto Rico y una Petición al Congreso y al Presidente de los Estados Unidos para que estos derechos sean respetados al actuar sobre nuestro status político. De ser aprobada por el pueblo, la Reclamación de Derechos Democráticos sólo podrá ser modificada o revocada mediante una consulta al pueblo y no podrá ser afectada por el resultado de las elecciones generales.

Artículo 5.- Las alternativas de Estado Libre Asociado y Estadidad incluidas en la Reclamación de Derechos Democráticos que se presentaría al pueblo el 8 de diciembre de 1991 son formas de status de unión permanente con los Estados Unidos.

La Reclamación de Derechos Democráticos no es una reclamación de cambio de status. El resultado del referéndum no se interpretará a favor ni en contra de cualquier alternativa de status o partido político. Tampoco se interpretará como una petición de separación, ni de modificación del presente status, ni del uso de las dos banderas, los dos himnos y los dos idiomas como dispone nuestro ordenamiento jurídico.

## Inscríbete ahora y vota el 8 de diciembre.

**COMISION ESTATAL DE ELECCIONES**

## Anejo 3

# CUANDO VEAS ESTE SIMBOLO
## hay un mensaje importante para ti.

Este es el nuevo símbolo de la Comisión Estatal de Elecciones, con su color distintivo. Cada vez que lo veas encabezando o firmando avisos, afiches, folletos u otras comunicaciones, es importante que te detengas a enterarte de su contenido, pues allí encontrarás información de utilidad que facilitará tu participación en los procesos eleccionarios que tendrán lugar en Puerto Rico este año y el próximo.

Porque tú tienes derecho a voz y voto, hemos escogido como nuestro símbolo el momento culminante de tu acción al ejercer ese derecho: cuando depositas tu voto en la urna.

Recuerda: Cuando veas este símbolo hay un mensaje importante para ti.

COMISION ESTATAL DE ELECCIONES

452

ANEJO 4

**Votar es la manera más clara de ejercer sin ninguna limitación tus derechos democráticos.**

**No desperdicies esta oportunidad de expresar tu pensamiento.**

## El 8 de diciembre ¡vota en el Referéndum!

COMISION ESTATAL DE ELECCIONES

ANEJO 5

El 3 de diciembre ¡vota en el Referéndum!

COMISION ESTATAL DE ELECCIONES

## – O –

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

*Disentimos.* En primer término, *es completamente errónea la determinación y conclusión de una mayoría de los integrantes de este Tribunal a los efectos de que carecemos de jurisdicción para intervenir en el presente recurso.* Por los fundamentos que a continuación expondremos, *y dados los hechos particulares y específicos de la situación ante nuestra consideración,* no hay la menor duda de que este Tribunal puede atender —y proveer el remedio adecuado para— los reclamos de los peticionarios Gierbolini Rodríguez y González, *vía el vehículo procesal del "mandamus".*

En segundo lugar, ya entrando en los méritos del recurso propiamente, le asiste la razón a los referidos peticionarios al afirmar que son inválidas las Leyes Núms. 85 y 86 de 17 de junio y 2 de octubre de 1991, respectivamente, y que, en consecuencia, resulta ser igualmente ilegal tanto el referéndum a celebrarse en virtud de las referidas leyes como el uso de fondos públicos en la implantación de dicho referéndum. *Las citadas Leyes Núms. 85 y 86 no sólo contravienen las disposiciones de la Ley Pública 600 aprobada por el 81er Congreso de los Estados Unidos de América el 3 de julio de 1950 y la Cláusula Territorial de la Constitución federal, sino que contravienen la propia Constitución del Estado Libre Asociado de Puerto Rico.* Veamos.

### I

Nuestro Puerto Rico fue uno de los *territorios* cedidos a los Estados Unidos por España, como "botín de guerra", mediante el Tratado de París de 1899. Por virtud de este Tratado, nuestra Isla del Encanto dejó de ser *territorio es-*

*pañol* para convertirse en *territorio norteamericano.* ¿Varió en algo dicha situación con el advenimiento del Estado Libre Asociado de Puerto Rico? Dicho de otra manera, dejó de ser Puerto Rico un territorio de los Estados Unidos a partir de la aprobación de nuestra Constitución en 1952, convirtiéndose en un "estado soberano" que tiene que consentir respecto a cualquier cambio que proponga sobre su "status", el Congreso de los Estados Unidos. *Vana ilusión, la de algunos.*

Aun cuando no albergamos dudas sobre el hecho de que la *Ley 600* del 81er Congreso de los Estados Unidos, 64 Stat. 310, aprobada el 3 de julio de 1950, autorizó al Pueblo de Puerto Rico a organizar un gobierno local bajo una Constitución de su propia adopción, *resulta sumamente importante que mantengamos siempre presente que al ser la referida Ley 600 "un acta" del referido Congreso, la misma no obliga a futuros Congresos y ésta puede ser enmendada unilateralmente por posteriores Congresos.* Véase *Community-Service Broadcasting, Etc. v. F.C.C.*, 593 F.2d 1102, 1103 (D.C. Cir. 1978).

Por otro lado, un ligero examen del historial legislativo de dicha ley es más que suficiente para demostrar que, no obstante el propósito del Congreso de concederle a Puerto Rico el poder de autogobernarse en cuanto a sus asuntos internos, *la intención del Congreso de los Estados Unidos fue claramente a los efectos de que dicha ley no alteraría en forma alguna el "status" de Puerto Rico respecto a los Estados Unidos.*

En ese sentido se manifestaron una serie de congresistas que laboraron intensamente en la aprobación de dicha medida legislativa, *inclusive los principales propulsores puertorriqueños de la misma.* En vistas públicas que se celebraron en torno a la aprobación de dicha Ley 600, el entonces Gobernador de Puerto Rico, *Hon. Luis Muñoz Marín*, se expresó de la siguiente forma:

*"You know, of course, that if the people of Puerto Rico should go crazy, Congress can always get around and legislate again. But I am confident that the Puerto Ricans will not do that, and invite congressional legislation that would take back something that was given to the people of Puerto Rico as good United States citizens".* (Énfasis suplido.)

El entonces Comisionado Residente, *Hon. Antonio Fernós Isern,* añadió:

*... S. 3336 would not change the status of the island of Puerto Rico relative to the United States. It would not alter the powers of sovereignty acquired by the United States over Puerto Rico under the term of the Treaty of Paris.* (Énfasis suplido.)

Según el informe del Comité de lo Interior y Asuntos Insulares del Senado:

The measure would not change Puerto Rico's fundamental political, social and economic relationship to the United States.

En palabras de un asesor legal de dicho Comité:

It is *our hope* and it is the *hope of the Government,* I think, not to interfere with the relationship of the compact but nevertheless *the basic power inherent in the Congress of the United States, which no one can take away, is in Congress ....* (Énfasis suplido.)[1]

Resulta sumamente ilustrativo —en relación con la *desacreditada teoría* de que lo que propició la referida Ley 600 fue la formalización de un "pacto" *(compact)* entre el Gobierno de los Estados Unidos y el Pueblo de Puerto Rico— lo expresado por el Profesor David M. Helfeld a los efectos de que:

Only two Constitutionally feasible ways appear open on which to ground a perpetually binding agreement: if Congress

---

[1] Para otras expresiones en el mismo sentido, véase D.M. Helfeld, *Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico,* 21 Rev. Jur. U.P.R. 255 (1952); J. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal,* Río Piedras, Universidad de Puerto Rico, 1985, págs. 146–160.

were first to give Puerto Rico independence and then enter into a bi-national treaty, or if by Constitutional amendment Congress were permitted to bind itself perpetually with respect to an abdication of power. There appears to be neither evidence of intent nor a Constitutional basis for arguing the permanence or the bilateral character of the compact. D.M. Helfeld, *Congressional Intent and Attitude Toward Public Law 600 and the Constitution of the Commonwealth of Puerto Rico,* 21 Rev. Jur. U.P.R. 255, 308 (1952).

Pero, hay algo más. Si alguna duda existía sobre que la referida Ley 600 no tuvo el efecto de alterar o cambiar nuestro *status* territorial, la misma rápidamente se ha disipado a la luz de una serie de decisiones emitidas por el Tribunal Supremo de los Estados Unidos mediante las cuales dicho Foro ha sostenido la validez constitucional de legislación aprobada por el Congreso de los Estados Unidos que abiertamente resulta discriminatoria contra Puerto Rico y los ciudadanos americanos residentes en la Isla. El fundamento aducido por el mencionado Tribunal para sostener la constitucionalidad de dichas leyes ha sido que el Congreso de los Estados Unidos puede tratar a Puerto Rico y sus ciudadanos residentes de manera distinta a los estados de la Unión *al amparo de la autoridad conferídale por la cláusula territorial de la Constitución federal.* Véanse: *Califano v. Torres,* 435 U.S. 1 (1978); *Torres v. Puerto Rico,* 442 U.S. 465 (1979); *Harris v. Rosario,* 446 U.S. 631 (1980).

A ese respecto, expresó en *Harris v. Rosario,* ante, págs. 651–652, el Tribunal Supremo federal que "el Congreso, *el cual tiene el poder bajo la Cláusula Territorial de la Constitución,* Constitución de los Estados Unidos, Art. IV, Sec. 3, cl.2, 'para hacer todas las Reglas y Reglamentos necesarios *con respecto al Territorio* ... perteneciente a los Estados Unidos,' *puede tratar a Puerto Rico de manera distinta a los Estados siempre que exista una base racional para sus acciones."* (Traducción nuestra y énfasis suplido.)

Lo así resuelto por el Tribunal Supremo nacional en-

cuentra apoyo en la historia. Si recordamos, el Congreso de los Estados Unidos *unilateralmente enmendó* la Constitución del Estado Libre Asociado *con posterioridad* a ésta ser "aprobada" por el Pueblo de Puerto Rico. Véase Ley Pública Núm. 447, 66 Stat. 327, mediante la cual el referido Congreso *eliminó* de nuestra Constitución la Sec. 20 de la Carta de Derechos. *Mal puede hablarse de que Puerto Rico es un ente soberano cuando otro ente político tiene el poder para unilateralmente enmendarle su Constitución.*

Nuevamente nos ilustra al respecto el profesor Helfeld:

> Though the formal title has been changed, in constitutional theory *Puerto Rico remains a territory.* This means that Congress continues to possess *plenary* but unexercised authority over Puerto Rico. *Constitutionally, Congress may repeal Public Law 600, annul the Constitution of Puerto Rico and veto any insular legislation which it deems unwise or improper.* (Énfasis suplido.) Helfeld, ante, pág. 307.

Pero, *todavía*, hay más. En fecha reciente un Comité del Senado de los Estados Unidos celebró vistas públicas, tanto en el Distrito de Columbia como en Puerto Rico, con el propósito de considerar la conveniencia de celebrar en nuestra Isla un plebiscito donde nosotros los puertorriqueños determinaríamos, de una vez y por todas, el *status* político de nuestro País. El referido Comité, presidido el mismo por el Senador Edward Bennett Johnston, lo es el Comité de Energía y Recursos Naturales (*Committee on Energy and Natural Resources). Dicho Comité es el que atiende, entre otros asuntos, todo lo referente a los territorios que poseen los Estados Unidos de América.* A nuestra manera de ver las cosas, la comparecencia —*voluntaria e informada al respecto*— de los líderes máximos de los tres principales partidos políticos existentes en Puerto Rico ante el referido Comité *constituye una aceptación, tácita e indirecta, de dichos líderes de que nuestro País, no obstante lo sucedido en 1952, continúa siendo un simple territorio de los Estados Unidos sujeto al poder plenario del Congreso de*

*los Estados Unidos bajo la Cláusula Territorial de la Constitución federal.*

Ante esa situación, los ciudadanos de este País —*y su Gobierno*— están *jurídicamente impedidos de imponerle condiciones, o trabas, al ejercicio de ese poder plenario del Congreso*. Siendo ello así, cualquier intento o acción a ese respecto del Gobierno de Puerto Rico —vía la aprobación, inclusive, de legislación por nuestra Asamblea Legislativa— constituye no sólo un *acto estéril e ineficaz*, sino que *ultra vires* por parte de esa Asamblea Legislativa. *Su acción a esos efectos no sólo contraviene la Cláusula Territorial de la Constitución federal y la citada Ley 600, sino que la Constitución de Puerto Rico, la cual fue promulgada al amparo, y es consecuencia, de éstas*. Como resultado de ello, *cualquier desembolso de dinero* que sea autorizado en la consecución o realización de esa *acción ultra vires* de la Asamblea Legislativa de Puerto Rico *es uno igualmente ilegal*.

El hecho que, *de momento*, las citadas Leyes Núms. 85 y 86 meramente puedan ser consideradas como una simple expresión de opinión pública *no* causa que nuestra conclusión sea prematura o incorrecta; *ello en vista de las circunstancias particulares y específicas de la situación ante nuestra consideración*.

En primer lugar, tomamos conocimiento judicial del hecho de que la citada Ley Núm. 85 —y sus alegadas "garantías de derechos democráticos"— es prácticamente una *copia exacta* de las Resoluciones Concurrentes Núms. 41 y 54, respectivamente, del Senado y de la Cámara de Representantes de Puerto Rico mediante las cuales se pretendió celebrar un referéndum con el propósito de *directamente* enmendar la Constitución de Puerto Rico; resoluciones concurrentes que fueron derrotadas al no contar con el voto afirmativo de las ⅔ partes de los miembros de la Asamblea Legislativa. Así, inclusive, surge del segundo "Por Cuanto" de la Exposición de Motivos de la citada Ley Núm. 85.

En segundo lugar, el referéndum a celebrarse el 8 de diciembre de 1991 es meramente un "primer paso" en la consecución del *verdadero objetivo o fin* de la Asamblea Legislativa; esto es, lograr que dichos "derechos democráticos" sean incorporados, *mediante enmienda al efecto*, a nuestra Constitución. Ello así expresamente surge del último de los "Por Cuantos" de la antes mencionada Exposición de Motivos de la Ley Núm. 85. En el mismo se expresa que "es necesario que el Pueblo de Puerto Rico tenga un vehículo mediante el cual exprese al Gobierno de Puerto Rico *la deseabilidad de consagrar estos derechos democráticos en la Constitución del Estado Libre Asociado de Puerto Rico ...*". (Énfasis suplido.) 1991 Leyes de Puerto Rico 809.

De manera, pues, que el Referéndum a celebrarse el próximo 8 de diciembre, y el dinero a gastarse en la implantación del mismo, *tienen el propósito expreso, y fin último, de lograr que se enmiende la Constitución de Puerto Rico*, incorporando a ésta los "derechos democráticos" enumerados en la Ley Núm. 85. Dichos "derechos", *nadie con seriedad puede negar*, constituyen condiciones o trabas que el Gobierno de Puerto Rico *pretende* imponerle al poder plenario que posee el Congreso de los Estados Unidos sobre Puerto Rico;[2] acción que es, repetimos, *jurídicamente im-*

---

[2] El Congreso de los Estados Unidos en el válido ejercicio del poder plenario que tiene sobre sus territorios podría, *a manera de ejemplo*, legislar con el propósito de: (1) concederle *unilateralmente* la independencia a Puerto Rico *sin* garantía alguna de ciudadanía americana para aquellas personas que nazcan en este País con posterioridad al día de efectividad del decreto de independencia (ello, naturalmente, confligiría directamente con el primero, tercero, y sexto de los alegados "derechos democráticos"); (2) decretar la celebración de un plebiscito en que los puertorriqueños tengan que decidir entre estadidad, sí o no; entre independencia, sí o no; o entre estadidad e independencia (cualesquiera de dichas alternativas estará en conflicto con el tercero de los llamados "derechos democráticos"); (3) decretar la celebración de un plebiscito entre las fórmulas de *status* político que entienda pertinentes, disponiendo que la fórmula ganadora sólo tendrá que obtener una simple mayoría (ello confligiría con el tercero y cuarto de los llamados "derechos democráticos"); (4) etc.

Naturalmente, el hecho de que el Congreso tenga ese poder plenario sobre Puerto Rico —poder que le autoriza a realizar lo que entiende pertinente y procedente— necesariamente no significa que el Congreso así lo ejercerá.

*permisible* por cuanto la misma contraviene la Constitución federal, la citada Ley 600 y la propia Constitución de Puerto Rico, la cual es una "criatura" de las primeras. *Lo que pretende hacer la actual administración de gobierno mediante la citada Ley Núm. 85 se asemeja a la situación, insólita e insostenible, del hijo menor de edad —el cual está sujeto a la patria potestad y autoridad de sus padres— que pretende imponer las condiciones bajo las cuales está dispuesto a vivir en la casa de sus progenitores.*

Poco importa, *repetimos*, que en estos momentos no se trate de un referéndum cuyo resultado tenga el efecto de directamente enmendar la Constitución del Estado Libre Asociado de Puerto Rico en abierta contravención de la citada Ley 600 y la Constitución federal. La expresa intención o propósito, a los fines antes mencionados, de la Asamblea Legislativa al aprobar la citada Ley Núm. 85 *permea e invalida todo el procedimiento, presente y futuro, relativo a la "consulta" que se le pretende hacer a la ciudadanía puertorriqueña bajo el pretexto de que se trata de una simple expresión de opinión pública.* Para declarar inválida la misma *no* se necesita esperar el resultado de dicha consulta y la implantación del segundo paso o etapa —referéndum para directamente enmendar la Constitución— *tendente a lograr la jurídicamente improcedente imposición de condiciones y obstáculos al poder plenario que tiene el Congreso de los Estados Unidos sobre el territorio de Puerto Rico.*

## II

Lo anteriormente expresado no sólo nos lleva a la *segunda* causa de nulidad de las citadas Leyes Núms. 85 y 86 de 1991 sino que, igualmente, constituye fundamento en apoyo del decreto de invalidez de las mismas. Dispone la Sec. 1 del Art. VII de la Constitución del Estado Libre Asociado de Puerto Rico que:

La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara. Toda proposición de enmienda se someterá a los electores capacitados en referéndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. *Cada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum.* Toda enmienda contendrá sus propios términos de vigencia y formará parte de esta Constitución si es ratificada por el voto de la mayoría de los electores que voten sobre el particular. Aprobada una proposición de enmienda, deberá publicarse con tres meses de antelación, por lo menos, a la fecha del referéndum. (Énfasis suplido.) L.P.R.A., Tomo 1, ed. 1982, pág. 380.

En lo pertinente a la cuestión hoy ante nuestra consideración, procede que se *enfatice* el hecho de que la transcrita disposición constitucional establece, de manera específica y expresa, que en el referéndum especial que se lleva a cabo con el propósito de que nuestra ciudadanía decida si procede o no incorporar a nuestra Constitución una, o varias, de las enmiendas propuestas por la Asamblea Legislativa, cada "proposición de enmienda *deberá votarse separadamente* y *en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum*". (Énfasis suplido.) Const. E.L.A., ante, pág. 380.

La fiel observancia de dicho requisito, no hay duda, resulta ser de extraordinaria y singular importancia para un país democrático y civilizado como el nuestro. Ello así por razón de que la Constitución de un país es la más fundamental y trascendental disposición legal que puede existir en el ordenamiento jurídico del mismo. La aprobación de una Constitución por la ciudadanía de un país sobreviene, de ordinario, luego del más profundo estudio y análisis del

que sean capaces las mentes privilegiadas de los más destacados juristas y distinguidos ciudadanos de dicho país.

Eso, nos enseña la historia, fue lo ocurrido durante la Asamblea Constituyente llevada a efecto en nuestro Puerto Rico, el fruto de la cual lo constituye la Constitución del Estado Libre Asociado de Puerto Rico. Los distinguidos y esforzados puertorriqueños que formaron parte de la misma consideraron, discutieron y analizaron, hasta la saciedad, cada una de las disposiciones que hoy forman parte de nuestra Constitución. Prueba fehaciente de ello lo constituye los debates llevados a cabo por los constituyentes; luego de los cuales, y antes que la ciudadanía de aquella época aprobara el fundamental documento, le fue explicada a ésta el significado de las cláusulas que componen el mismo.

Resulta, en consecuencia, enteramente necesario y procedente que antes de que se le requiera a los ciudadanos de este País que emitan su voto sobre si nuestra Constitución debe ser objeto de enmienda, dicha ciudadanía no sólo deberá ser adecuadamente informada sobre la enmienda propuesta sino que la misma debe serle sometida en la forma más simple y clara posible; *esto es, en forma tal que evite confusión.* Ahí precisamente radica la *razón de ser* de la clara y expresa *prohibición constitucional* a los efectos de que: "[c]ada proposición de enmienda deberá votarse separadamente y en ningún caso se podrá someter más de tres proposiciones de enmienda en un mismo referéndum." Const. E.L.A., ante, pág. 380.

No hay que ser muy perspicaz para poder darse uno cuenta de que el Referéndum a ser celebrado el próximo 8 de diciembre de 1991 *adolece del vicio y condición expresamente prohibido por la referida disposición constitucional:* en el mismo no sólo no se puede votar en forma separada por cada uno de los alegados "derechos democráticos" sino que se requiere que se vote por seis de ellos en forma conjunta. *El vicio de que adolece el referéndum en contro-*

*versia es tan palpable y grave que el mismo salta a la vista y hiere la retina.* Véase *In re Roldán González,* 113 D.P.R. 238, 242 (1982).

Es cierto que el Referéndum del 8 de diciembre no es uno cuyo resultado directo es enmendar la Constitución del Estado Libre Asociado de Puerto Rico. Pero, como señaláramos anteriormente, dicho Referéndum —según expresa la propia Asamblea Legislativa en la Exposición de Motivos de la citada Ley Núm. 85— *es el primer paso o etapa de un procedimiento integral diseñado y encaminado, precisamente, a enmendar la Constitución.* En consecuencia, le es de aplicación al mismo la Sec. 1 del Art. VII de nuestra Constitución, ante.

Por otro lado, e independientemente de lo antes señalado, no creemos que nadie será capaz de negar que el Referéndum pautado para el 8 de diciembre *viola, cuando menos, el espíritu del mencionado Art. VII, Sec. 1 de la Constitución del Estado Libre Asociado de Puerto Rico*; situación que el Gobierno debe evitar a toda costa. *Cuando de la Constitución se trata, el Gobierno no puede ampararse en tecnicismos; éste es el primero que tiene la obligación, continua e inescapable, de evitar la violación de la letra y el espíritu de nuestra Constitución.*

Pero, *todavía,* hay más. *La citada Ley Núm. 85 ha "agrupado" una serie de "derechos democráticos" que son contradictorios e inconsistentes entre sí, lo cual, naturalmente, tiene la indeseable consecuencia de crear una gran confusión entre nuestra ciudadanía.* Para percatarse de ello, basta con una simple lectura de la citada Ley Núm. 85; esto es, de los seis "derechos democráticos" que alegadamente quedan garantizados por un voto en la afirmativa.

Simplemente, a manera de ejemplo, ¿cómo es posible que alguien, con cara seria, le pueda afirmar a los ciudadanos de este País que las personas que nazcan, luego de la fecha en que Puerto Rico se convierta en un país libre e

independiente, tienen garantizada la ciudadanía americana cuando ello constituye una imposibilidad jurídica? ¿A quién se pretende engañar y confundir?

¿Cómo es posible que se le haga creer a nuestra ciudadanía que un voto en la afirmativa le garantiza a ellos "el derecho inalienable a determinar libre y democráticamente nuestro *status* político" cuando es incuestionable que el Congreso de los Estados Unidos tiene el poder plenario para, si así lo desea, *unilateralmente* decidir nuestro futuro político? *Las medias verdades, la vaguedad y la confusión contenidas en, y que permea, la citada Ley Núm. 85 deberían de ser suficientes, por sí solas, para que este Tribunal, en un acto de responsabilidad y valentía judicial, anule de un plumazo el Referéndum en controversia.*

## III

Ante esta grave y delicada situación que afecta a nuestro País, la cual requiere un urgente, ilustrativo y ejemplarizante pronunciamiento de parte de su más alto Foro judicial, *¿qué hace el Tribunal?* Simple y sencillamente se niega a intervenir en la situación planteada aduciendo, como único fundamento de su negativa, que carece de jurisdicción para actuar. *¿Es ello jurídicamente correcto?* La contestación en la *negativa* resulta obvia. *Veamos.*

Asumiendo —únicamente a los fines de la argumentación— que no tenemos autoridad o facultad para, en jurisdicción original, emitir un auto de *injunction*,[3] *no* existe impedimento jurídico alguno por el cual —*acogiendo el recurso radicado por los peticionarios como una solicitud de "mandamus"*— no podamos emitir un auto de *mandamus*, dirigido el mismo al Presidente de la Comisión Estatal de Elecciones, *para que éste proceda a cumplir con su deber ministerial de aplicar la Constitución del Estado Libre*

---

[3] Véase 32 L.P.R.A. sec. 3522.

*Asociado de Puerto Rico* y, por ende, se niegue a darle curso y poner en vigor las disposiciones de las citadas Leyes Núms. 85 y 86 por ser éstas contrarias a, y violativas de, la referida Constitución.

En primer lugar, no debe haber duda alguna en cuanto a nuestra facultad para dictar el auto de *mandamus* en jurisdicción original. De acuerdo a la Sec. 5 del Art. V de la Constitución del Estado Libre Asociado, "[e]l Tribunal Supremo ... podr[á] conocer en primera instancia de ... aquellos otros recursos y causas que se determinen por ley". Art. V, Sec. 5, Const. E.L.A., ante, pág. 357. El auto de *mandamus* es uno de dichos recursos. *Dávila v. Superintendente de Elecciones*, 82 D.P.R. 264 (1960); Arts. 649 y 650 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3421 y 3422.

De otro lado, tampoco está en controversia el hecho de que los peticionarios han cumplido con todos los requisitos, formales y sustantivos, del recurso de *mandamus;* esto es, "[s]e ha invocado correctamente la jurisdicción original de este Tribunal ya que la solicitud va dirigida contra [varios] de los principales funcionarios del gobierno, se levantan cuestiones de gran interés público y el problema planteado requiere una resolución pronta y definitiva". *Partido Popular v. Gallardo*, 56 D.P.R. 706, 711 (1940); *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *Dávila v. Superintendente de Elecciones*, ante.

Por definición de la ley, "[e]l auto de *mandamus* es un auto altamente privilegiado ... dirigido a alguna persona ... requiriéndol[e] para el cumplimiento de algún acto ...", 32 L.P.R.A. sec. 3421. El *mandamus* está concebido para obligar a cualquier persona a cumplir un acto que la ley particularmente le ordena como un deber resultante de un empleo, cargo o función pública, cuando ese deber no admita discreción en su ejercicio, sino que es ministerial. 32 L.P.R.A. sec. 3422. *Espina v. Calderón, Juez, y Sucn. Espina, Int.*, 75 D.P.R. 76 (1953); *Great Am. Indem. v. Go-*

*bierno de la Capital,* 59 D.P.R. 911 (1942); *Pueblo v. La Costa, Jr., Juez,* 59 D.P.R. 179 (1941); D. Rivé Rivera, *Recursos Extraordinarios,* San Juan, Universidad Interamericana, 1989, pág. 85. En síntesis, "el auto de *mandamus* es el recurso apropiado para compeler al cumplimiento de un deber que se alega impuesto por la ley ...". *Hernández Agosto v. Romero Barceló,* ante, pág. 418.

De acuerdo a esta definición, y a la naturaleza del recurso, el problema central radica en determinar si al exigir el cumplimiento de un deber ministerial el recurso de *mandamus tan sólo puede ordenar la actuación afirmativa de una persona o funcionario.*

Debemos admitir, de entrada, que la *gran mayoría* de nuestras decisiones, relativas a la expedición del auto de *mandamus,* es a esos efectos. Hemos resuelto que se justifica la expedición del auto de *mandamus* para *obligar* a un juez a decidir, *Pueblo v. La Costa, Jr., Juez,* ante; para *obligar* a un funcionario municipal a pagar lo que se le debe al demandante de los fondos públicos, *Ortiz v. Palmer,* 61 D.P.R. 677 (1943); para *obligar* al Departamento de Hacienda a cobrarle las contribuciones a un competidor cuando intencionalmente, o por negligencia no se ha hecho, *Descartes, Tes. v. Tribl. Contrib. y Trigo Hnos.,* 73 D.P.R. 295 (1952); para *obligar* a un notario a abrir su Protocolo y *expedir* una copia certificada a la parte interesada, *Román v. Agosto,* 27 D.P.R. 574 (1919); para *examinar* documentos públicos, *Prensa Insular de P. R. v. Cordero, Auditor,* 67 D.P.R. 89 (1947); para que *determine* si determinada persona ha sido electa a un cargo público, *Añeses v. Consejo Ejecutivo,* 38 D.P.R. 268 (1938); para *conceder* una pensión cuando el jubilado ha cumplido con todas las condiciones de ley, *Tirado v. Junta de Retiro de Empleados,* 38 D.P.R. 1002 (1928); para que la Junta Examinadora de Ingenieros *le expida* licencia a quien ha cumplido con todos los requisitos de ley, *Llovet v. Junta Exam. de Ingenieros, Etc.,* 40 D.P.R. 583 (1930); para que la Junta de Libertad Bajo Pa-

labra *asuma jurisdicción* en un caso, *Garay v. Junta Libertad Bajo Palabra*, 74 D.P.R. 559 (1953); para *inspeccionar y fotocopiar* documentos electorales, *Dávila v. Superintendente de Elecciones*, ante; para *compeler* al Presidente del Consejo Superior de Enseñanza a firmarle un diploma a un estudiante que ha cumplido con todos los requisitos para el grado académico, *Rodríguez v. Gallardo*, 64 D.P.R. 345 (1944); para *ordenarle* a un alcalde restituir en sus cargos a funcionarios o empleados ilegalmente despedidos, *Caballero v. Romero Barceló*, 103 D.P.R. 1 (1974). Véase Rivé Rivera, *op. cit.*, págs. 85–86.

Ahora bien, en lugar de ordenar que una persona *actúe* para cumplir con un deber ministerial —como se hace en todos estos casos— *¿puede exigirse, vía la expedición de un auto de "mandamus" que una persona se abstenga de actuar?* A nuestro modo de ver las cosas, *no* debe haber duda sobre ello. *De hecho, un estudio de nuestra jurisprudencia demuestra que así lo hemos dispuesto en el pasado.* A esos efectos, véase *Soto v. Alcalde, Municipio de Bayamón*, 99 D.P.R. 54, 57 (1970), en donde expresamente resolvimos que el *"mandamus* es un *remedio adecuado para impedir* que un funcionario o junta separe de su empleo a un funcionario o empleado, sin autoridad para ello". (Énfasis suplido.) Véanse, en adición: *Gil v. Chardón, Comisionado*, 41 D.P.R. 210, 218 (1930); *Colón v. Iglesias, Comisionado*, 64 D.P.R. 851 (1945); *Abella v. Piñero, Gobernador*, 66 D.P.R. 690 (1946); *Bezares v. González, Alcalde*, 84 D.P.R. 468 (1962). Y es que ello tiene que ser así *por cuanto no existe ninguna objeción lógica al principio de un "mandamus" negativo.* Menos aún en este caso. Lo contrario sería definir el remedio superficialmente. En estas situaciones lo que se manifiesta como negativo en su forma, es, innegablemente, positivo sustantivamente.

El propósito esencial del auto de *mandamus* es *obligar* a la *obediencia ministerial* de una *ley válida,* a través del cumplimiento de deberes específicos. El *principal* deber

ministerial de la Comisión Estatal de Elecciones, y de su presidente el Sr. Juan R. Melecio, *es el de actuar conforme a derecho*. Cualquier intento de poner en vigor una ley que *claramente contraviene* la Constitución de Puerto Rico y la de los Estados Unidos, *constituye una violación del mandato constitucional de actuar legalmente y conforme a derecho, deber impuesto por estas mismas Constituciones*. El recurso de *mandamus* obliga a actuar afirmativamente *sólo* cuando se incumple con los deberes que ordena *una ley válida*. Por el contrario, *puede exigir el que no se acate una actuación o ley inconstitucional, porque si no se estaría promoviendo el quebrantamiento de un deber constitucional*. Como las Leyes Núms. 85 y 86, bajo las cuales la Comisión Estatal de Elecciones se propone llevar a cabo el Referéndum del 8 de diciembre de 1991 son inconstitucionales, *el auto de "mandamus" obligaría a la Comisión al cumplimiento de su verdadero deber: el acatamiento de la Constitución y, por ende, el abstenerse de poner en vigor unas leyes que obviamente son inconstitucionales*. Véanse: F. Ferris, *The Law of Extraordinary Legal Remedies*, St. Louis, Thomas Law Book Co., 1926, pág. 227. *New York Post Corporation v. Leibowitz*, 163 N.Y.S.2d 409 (1957); *Mooney v. Cohen*, 290 N.Y.S. 343 (1936).

En relación con este aspecto, resultan particularmente ilustrativas unas expresiones que se hicieron en *Mooney v. Cohen*, ante. Allí se expresó, a la pág. 346, que:

Respondents raise the preliminary objection that mandamus is not the proper remedy, arguing that the purpose of mandamus is to compel administrative functioning fixed by law, to enforce ministerial action, not to halt or prevent it. *This contention defines the remedy but superficially.* Its integral objective is to enforce ministerial obedience to valid law enjoining specific duties. The board of elections is charged with *the duty of acting according to law* and must decide for itself the validity of the law precedent to compliance with it. *An attempt to act under an invalid, void, or unconstitutional act or statute is a failure to comply with the constitutional injunct to function legally.* Mandamus will lie tó compel action only when there is

an avoidance of duty in the face of valid law. *It will not compel obedience to an unconstitutional act, as such would enforce a breach of constitutional duty. If an act, pursuant to which the board of elections purports to function, is unconstitutional, mandamus will lie to compel the board to the positive performance of its duty which would be inaction.* (Traducción y énfasis nuestros.)

No hay duda, en consecuencia, que en vista del hecho de que las citadas Leyes Núms. 85 y 86 de 1991 contravienen la Constitución del Estado Libre Asociado de Puerto Rico, *en el presente caso procede la expedición de un auto de "mandamus" dirigido al Presidente de la Comisión Estatal de Elecciones ordenándole que cumpla con su deber ministerial de acatar la referida Constitución y, por ende, no poner en vigor, ni darle curso, a las citadas Leyes Núms. 85 y 86 de 1991.*

## IV

En resumen, nos enfrentamos a una situación en que, al este Tribunal no estar en disposición de actuar de una manera objetiva y ejemplarizante, *la ciudadanía puertorriqueña será sometida a un proceso de referéndum el próximo 8 de diciembre de 1991 no sólo ilegal, sino que confuso y estéril, con el consiguiente gasto ilegal de fondos públicos.* Resulta verdaderamente lamentable que el Tribunal se haya negado a así actuar.